LISTON *v.* STATE OF INDIANA.

[No. 368S50. Filed September 24, 1969. No petition for rehearing filed.]

*Bruce E. Bloom, Bruce R. Snyder,* of Fort Wayne, for appellant.

*Theodore L. Sendak,* Attorney General, and *Robert F. Hassett,* Deputy Attorney General, for appellee.

HUNTER, J.—Appellant was charged with assault and battery with intent to kill and attempted escape. Upon a plea of not guilty to both counts, appellant was tried without a jury and found guilty of each crime.

A motion for new trial was filed in both cases and appellant obtained permission from this court to consolidate them on appeal.

A review of the evidence most favorable to the state follows: on September 3, 1967, appellant was a prisoner in C block of the Allen County jail. C block contained about fourteen (14) prisoners. To get to the block one would first have to open a steel outside door, walk along a hallway of about fifty (50) or sixty (60) feet to an electric door, which opened into the cell block. About fourteen (14) prisoners were housed in C block on September 3, 1967, in cells each of which contained four (4) bunks. In addition to the cells, C block contained a day room where the prisoners ate their meals and carried on various recreational activities.

On the above date, appellant and another prisoner named Chapman were found in one of the cells beating a third prisoner. At the time, most of the other prisoners were in the day room, the door to which was open, allowing free passage

from that area to the cells. As soon as the beating was discovered, deputies came into the cell block and removed the beaten prisoner. Soon thereafter they returned and told appellant to come out as they were going to put him in the security ward. Appellant responded that he wasn't going anywhere and that if the deputies wanted him they were going to have to come and get him. During this time appellant and three other prisoners were standing in the hallway by the day room. The deputies were also in the hallway between the steel outside door and the electric door. The other prisoners were still in the day room.

At this point the evidence is somewhat conflicting. However it appears that one of the deputies made a comment about getting the dogs and they left the block area. After the deputies left, several of the prisoners began building a barricade in the hallway out of mattresses. One of the prisoners began breaking out the glass in the cell windows with a piece of steel strapping pulled off from a housing unit contained in the cell block. Another prisoner proceeded to break up the sinks and toilets which were found in each cell. There is no evidence that appellant participated in this destruction. Somehow the deputies succeeded in locking the day room door thereby separating the four prisoners in the hallway from the rest in the day room.

When the deputies returned with a dog and attempted to enter the block area, they were greeted with a barrage of procelain chunks obtained from the broken sinks and toilets. While the deputies had been gone, the four prisoners in the hallway had succeeded in unlocking the day room door thus allowing those prisoners to also participate in the activities.

Various threats were made by the prisoners, including appellant, to the effect that they would kill the first deputy to come into the cell block. These and other threats were repeated throughout the disturbance.

The deputies attempted to advance into the block area with the dog, but the dog became frightened and had to be taken out. Throughout this time the prisoners continued to throw the porcelain, several pieces of which struck the deputies who were now wearing protective helmets.

The jail officials next attempted to use a fire hose with the idea of forcing the prisoners up against a wall, making it possible for the deputies to take them out one by one. However, this proved ineffective and so it was decided that tear gas would have to be used if jail security was to be maintained and the disturbance quelled. Accordingly, tear gas was shot into the block area and shortly afterwards the prisoners came out, one by one and were taken down a stairway to the chapel where they were kept until further arrangements could be made.

Sometime during the disturbance, Officer Dullaghan was inside the block area and was struck on the helmet and on the hand by a piece of porcelain which, by his own testimony, he saw appellant throw. The injury to his hand required four stitches and a scar remains to this day.

In light of the foregoing evidence, we shall first discuss appellant's conviction of assault and battery with intent to kill. Ind. Ann. Stat. § 10-401(a) (1969 Supp.) defines the offense as follows:

> "Whoever with intent to kill another human being perpetrates an assault or assault and battery upon the other human being, shall upon conviction, be imprisoned in the state prison for not less than two [2] nor more than fourteen [14] years."

The phrase "assault and battery" is defined in Indiana in the following terms:

> "Whoever in a rude, insolent or angry manner, unlawfully touches another, is guilty of an assault and battery . . ." Ind. Ann. Stat. § 10-403 (1969 Supp.)

It is quite apparent, therefore, that to sustain the conviction of assault and battery with intent to kill there must be substantial evidence of probative value from which it could be concluded that (1) the appellant unlawfully touched Officer Dullaghan in a rude, insolent or angry manner, and (2) appellant engaged in such unlawful conduct with intent to kill Officer Dullaghan. *Durham v. State* (1968), 250 Ind. 555, 238 N. E. 2d 9.

In determining whether there is sufficient evidence to uphold the conviction, this court has said many times that it will not weigh the evidence or determine the credibility of the witnesses. Also a verdict on appeal will not be disturbed if there is substantial evidence of probative value sufficient to establish every material element of the crime. Only that evidence most favorable to the state and all reasonable inferences to be drawn therefrom will be considered on appeal.

When looking to the evidence most favorable to the state, it was established by the testimony of Officer Dullaghan that appellant struck the officer with a piece of porcelain. The exact piece was not identified at trial but the surface area of representative pieces measured several square inches. From the foregoing it would appear that the first element as set out above has been clearly established i.e. the unlawful touching in a rude, insolent or angry manner, and appellant does not challenge this fact. Appellant does contend, however, that the state failed to prove the specific intent to kill Officer Dullaghan as required by the statute.

In *Petillo v. State* (1950), 228 Ind. 97, 101, 89 N. E. 2d 623, 624, where defendant was charged with the same crime as here, this court said:

". . . that the intent was a question for the court, the proof of which rested upon the state; and in determining the question it was the duty of the court to consider all the facts and circumstances disclosed by the evidence bearing upon it. The felonious intent in

such a case might have been shown by direct evidence, such as lying in wait for an opportunity, with a deadly weapon; and, in the absence of any such direct proof, *if the assault and battery was with a deadly weapon, used in such a manner as to be reasonably calculated to cause death, the intent to kill might be inferred from the act itself.*" (our emphasis.)

The question to be answered is whether the porcelain missile thrown by the appellant could have caused a fatal injury. Representative pieces of porcelain introduced by the state measured: (1) one and one-half by three and one-fourth by six inches (1 1/2″ x 3 1/4″ x 6″); (2) three inches by four inches (3″ x 4″); and (3) five by three and three-fourths by three by two and one-half by two and three-fourths inches (5″ x 3 3/4″ x 3″ x 2 1/2″ x 2 3/4″). Although these pieces were not directly connected with the appellant, they were accepted as being representative of all the porcelain thrown by the prisoners, appellant included.

In *Kidwell v. State* (1967), 249 Ind. 430, 230 N. E. 2d 590, 592 we stated:

"Whether a particular object is or is not a dangerous or deadly weapon depends in many cases upon the manner in which it is used."

It seems fairly obvious to this court that pieces of porcelain of the size introduced into evidence by the state, which would of necessity have rough and jagged edges, having been obtained from broken sinks and toilets, constitute a deadly weapon when thrown at another human being at close range, to-wit: ten to fifteen feet as was here done. The fact that the actual injury caused was relatively slight is not controlling. Instead of cutting a finger the piece could have struck him in such a place as to cause serious injury or death. In fact one piece did hit Officer Dullaghan on the helmet and, had it not been for the helmet, a serious injury could have resulted. However we need not speculate as to what might

have happened. It is enough to say that the porcelain constituted a deadly weapon when thrown at such close range, the pieces being of considerable size.

As has been stated, the use of a deadly instrument used in a manner reasonably calculated to cause death is sufficient to sustain an inference of an intent to kill. *Petillo v. State, supra.* Supplementing this inference however is the testimony of the various deputies pertaining to the threats made by appellant and the other prisoners. On several occasions appellant was heard threatening to kill the first deputy to come inside the block. Direct threats were also made to specific deputies and at one point when Dullaghan was standing directly in front of appellant, some ten to fifteen feet away, appellant said, "Let's kill him."

Appellant takes the position that the statement made did not reflect a genuine desire or intent to kill anyone but were rather the product of a desire to flaunt and frighten those people who kept him incarcerated. We are then asked to draw upon our knowledge and experience with human behavior and recognize that men incarcerated over long periods of time frequently use language of a violent nature as a means of releasing the emotional tension which inevitably builds during a period of confinement. We would tend to agree with appellant had the threats been the only evidence of intent. However, experience has also taught us that where one couples a threat with an overt act of violence, from which a reasonable inference might be drawn that such act was calculated to cause death, such threat was in all likelihood made in earnest and we are inclined to take it at its face value.

We are of the opinion, therefore, that the evidence and all reasonable inferences to be drawn therefrom is sufficient to sustain appellant's conviction of assault and battery with intent to kill. Consequently appellant's contention that the verdict is contrary to law is also without merit.

We next turn to the question of the sufficiency of the evidence as it relates to appellant's conviction of attempted escape.

The penalty for attempted escape is set out at Ind. Ann. Stat. § 10-1816 (1969 Supp.) as follows:

"Any person, lawfully confined in any penal institution, prison or jail of the State of Indiana, who attempts to make an escape from such institution, prison or jail, and such attempt meets with failure, shall be guilty of attempted escape and, upon conviction thereof, shall be liable to a fine in the amount equal to two [2] times the value of any damage that may have been done to the physical properties of the penal institution, prison or jail from which the escape is attempted, to which may be added imprisonment for any determinate period of not less than one [1] year nor more than five [5] years, or to both such fine and imprisonment."

An *attempt* was defined in *Barrick v. State* (1954), 233 Ind. 333, 119 N. E. 2d 550, 553 quoting *People v. Sullivan* (1903), 173 N. Y. 122, 65 N. E. 989, 993 as follows:

" 'Whenever the acts of a person have gone to the extent of placing it in its power to commit the offense unless interrupted, and nothing but such interruption prevents his present commission of the offense, at least then he is guilty of an attempt to commit the offense, whatever may be the rule as to his conduct before it reached that stage.' "

It is axiomatic that to be convicted of a crime, criminal intent must be established. So also by the very definition of attempt, it being the commencement of the consummation, intent would again have to be shown.

Turning to the evidence most favorable to the state we note that (1) a general disturbance had erupted in C block after the removal of one prisoner and the attempted removal of appellant; (2) considerable damage was caused to the block area where the prisoners had broken out the windows and

window frames, broken the sinks and toilets and pulled off steel strapping and part of a metal housing unit contained in the hallway; (3) that four of the prisoners, including appellant, succeeded in unlocking the day room door, allowing those prisoners inside to circulate throughout the block area; (4) that the prisoners had built a barricade in the hallway of mattresses and other articles in an attempt to keep the deputies out of the block area; and (5) that after several attempts by jail officials to get the prisoners out of the block, tear gas was successfully used and the prisoners removed.

At the same time we must also note a complete *lack* of evidence as to an intent on the part of any one of the prisoners, appellant included, to *break out* of the jail. On the contrary, it would appear that the prisoners intended to stay in the block as long as possible.

Appellee points to the words of appellant, repeated several times, "We're in this together" contending that such words, coupled with his acts and those of the other prisoners evidence an intent to escape. The mere phrase "We're in this together" in all probability was spoken in reference to the general disturbance and defiance of jail authorities in which the prisoners were involved and for which they knew there would be severe consequences. Certainly those words, by themselves, in no way indicate an attempted escape.

Nor can one reasonably infer from their acts that the prisoners intended to escape. Although the windows and window frames were broken and the wire mesh found immediately outside the window was pushed back against the bars, there is no evidence that any holes were found in the wire mesh or that the bars had been dislodged or bent. Nor was there a showing that the prisoners had any apparent means of removing the bars to effect an escape.

As to an escape through the door leading into the block area, an inference that the prisoners and more specifically appellant, intended to escape by that route is even less reason-

able. They had built a barricade in their very path of escape. Approximately fifteen jail personnel and police officers, armed with riot batons stood outside the door. The fact that the deputies, on occasion, opened this door and that the outside door had been opened for the fire hose, thereby weakening jail security, lends no credence to the argument that the prisoners were attempting to escape.

Appellee also points to the fact that one of the prisoners, at one point during the disturbance was pounding on the outer steel door with a metal panel. However, there was evidence to the effect that little or no damage resulted and appellee failed to show, either by direct evidence or by argument to this court, how such pounding could have in any way aided an escape. Appellee certainly would not have us believe that such pounding, which barely left a mark on the steel door was intended to open such door. The prisoners had already demonstrated their adeptness at opening locks by their opening of the day room door which had been previously locked. Why then, would they resort to such a primitive method in opening the steel door, especially when they knew approximately fifteen policemen were on the other side? This court is somewhat mystified as to how one could reasonably infer from the above named actions, an intent to escape.

We recognize the rule that we may not weigh the evidence and may only review that evidence most favorable to the state to determine, on a sufficiency of the evidence question, whether we shall affirm or reverse the judgment of the trial court. Such appellate duty, of which we take cognizance, in far too many cases requires that we probe and sift the evidence. Thus, if as a result of our probing and sifting the evidence most favorable to the state, we determine that the residue of facts is so devoid of evidence of probative value and reasonable inferences adduceable therefrom, as to preclude guilt beyond a reasonable doubt, we should so declare. A failure to do so is a rejection of our

duty as an appellate tribunal and tantamount to the enunciation of a rule that any evidence no matter how infinitesimal or inferences drawn therefrom, whether based on speculation or conjecture, would be sufficient to establish guilt beyond a reasonable doubt. This we are not inclined to do for to assume such a judicial posture, neglecting our appellate responsibility, would reduce the appellate process to an exercise in impotent and meaningless futility. See *Manlove v. State* (1968), 250 Ind. 70, 232 N. E. 2d 874; *Baker v. State* (1956), 236 Ind. 55, 138 N. E. 2d 641. We would therefore conclude that appellant's conviction of attempted escape is not sustained by sufficient evidence and should be reversed.

Judgment reversed in part, affirmed in part.

DeBruler, C. J., Arterburn and Givan, JJ., concur; Jackson, J., concurs in part and dissents in part with opinion.

### CONCURRING AND DISSENTING.

JACKSON, J.—I concur in the result of that portion of the majority opinion reversing the conviction of appellant on the charge of attempted escape.

I dissent to that portion of the opinion affirming the conviction on the charge of assault and battery. Without going into detail, it is sufficient, for the purpose of the dissenting opinion herein, to say that at all times with which we are here concerned appellant was in custody and under the complete control and domination of the police authorities. The threats by appellant and three other prisoners could have at the option of the police been rendered completely ineffective. I agree that appellant was guilty of assault and battery upon the officer. I do not concur in the conclusions of the majority opinion that the assault was with the intent to kill. This Court has here again erroneously extended the definition of a deadly weapon far beyond the legislative intent. Under the present thinking of the Court as delineated in some of its

recent decisions a cup of coffee might be determined to be a deadly weapon, as I assume, under certain circumstances it might be possible to drown a person therein; or by throwing a cup of coffee in a person's face confuse or blind the person so he could fall off a lunch room stool and hit his head on a piece of furniture and thus allege he was the victim of an assault with a deadly weapon.

The conviction on the charge of assault and battery with intent to kill should be reversed and remanded with instructions to grant appellant's motion for a new trial.

NOTE.—Reported in 250 N. E. 2d 739.