# FOR PUBLICATION



FILED

Aug 15 2014, 7:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KAREN CELESTINO-HORSEMAN**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DEE WARD, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1401-CR-25 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Jeffrey L. Marchal, Master Commissioner
Cause No. 49G06-1304-FB-25434

**August 15, 2014**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**

During the early morning hours on April 10, 2013, Appellant-Defendant Dee Ward repeatedly struck J.M. with a leather belt, causing J.M. to suffer extreme pain and serious bruising from her waist to her ankles. J.M.'s mother and step-father called 911 upon discovering J.M.'s injuries immediately after Ward dropped J.M. off at their home. The medical personnel who treated J.M. observed the severity of J.M.'s injuries. In the course of receiving treatment, J.M. indicated to the treating paramedic and emergency room forensic nurse that her injuries were caused by Ward. Ward was subsequently charged with and convicted of Class C felony battery and Class A misdemeanor domestic battery.

On appeal, Ward contends that the trial court abused its discretion in admitting J.M.'s identification of him as the attacker through the testimony of the treating paramedic and forensic nurse. Ward also contends that the evidence is insufficient to sustain his conviction for Class C felony battery, *i.e.*, battery committed by means of a deadly weapon. Concluding that the Confrontation Clause does not apply because J.M.'s statements to the treating paramedic and forensic nurse were not testimonial and that the evidence is sufficient to prove that Ward committed the underlying battery by means of a deadly weapon, we affirm.

**FACTS AND PROCEDURAL HISTORY**

As of April of 2013, Ward and J.M. had been dating, off-and-on, for a period of nearly two years. During this time, J.M. sometimes stayed overnight with Ward. On occasions when she did not stay with Ward, J.M. would stay with her mother and step-father. Also during this time, Ward visited the home of J.M.'s mother and step-father on numerous

2

occasions. J.M.'s step-father was also familiar with the vehicle driven by Ward.

J.M. did not stay with her mother and step-father on the night of April 9, 2013. During the mid- to late-afternoon on April 10, 2013, J.M.'s step-father saw Ward drive up in front of his home. After the vehicle stopped, J.M. exited the passenger side of the vehicle and began to walk toward the home. Ward then drove off as "quick as possible." Tr. p. 146.

J.M.'s step-father noticed that J.M., who normally walked quickly, was moving "very gingerly." Tr. p. 144. J.M.'s hands were shaking, and it appeared as though "every step hurt her." Tr. p. 145. J.M. was also hanging her head and crying. When J.M. reached the home, she told her step-father that she was hurt and asked where her mother was. After looking at J.M., J.M.'s step-father knew that something was "really wrong." Tr. p. 148.

When J.M.'s mother saw J.M., she observed that J.M. appeared to be in pain. J.M. leaned on the kitchen counter, asked for a cigarette, pulled her pants down to her ankles, and showed her mother her buttocks and legs. J.M. told her mother, "I'm hurting, it hurts." Tr. p. 123. J.M.'s mother could see that J.M. had pink, red, and purple colored welts all across her buttocks and down both the inside and outside of both of her legs. The welts extended from J.M.'s hips to her ankles. J.M. was still crying and seemed ashamed, hurt, and scared. Despite J.M.'s request to the contrary, J.M.'s mother asked J.M.'s step-father call 911.

Paramedic Linda Hodge-McKinney responded to the 911 call. Paramedic Hodge-McKinney had been trained in dealing with domestic violence cases. She had previously responded to over 100 cases involving victims who were struck with a belt, and was trained to recognize injuries caused by a belt. When paramedic Hodge-McKinney met with J.M.,

3

J.M. was weak and quiet, but responsive. J.M. seemed scared and was whimpering. J.M. indicated that Ward had "beat her with a belt and wouldn't let her leave." Tr. p. 202.

While being examined by paramedic Hodge-McKinney, J.M. stated that she was in "a lot of pain." Tr. p. 205. When paramedic Hodge-McKinney asked "[o]n a scale of one to ten, with one being the least amount of pain you've ever been in, ten being the most amount of pain you've ever been in," J.M. rated her pain a ten. Tr. pp. 205-06. J.M. indicated that the pain was "the most pain she's ever felt in her life." Tr. p. 218. A police officer who responded to the scene also observed that J.M. was suffering from "[m]assive bruising, basically all over her body especially her legs and buttock, welts, dark blue and black bruises. Pretty severe." Tr. p. 161.

In light of the severity of J.M.'s injuries, paramedic Hodge-McKinney determined that J.M. required hospitalization. Paramedic Hodge-McKinney was concerned that J.M. may have been suffering from internal injuries to her kidneys or abdomen. Paramedic Hodge-McKinney transported J.M. to Methodist Hospital.

At Methodist, J.M. was treated in the emergency room by forensic nurse Julie Morrison. While treating J.M., forensic nurse Morrison observed that J.M. was "obviously in a lot of discomfort, she was rolled up in a ball … a near fetal position on one side, all hunched over, sort of in a protective sort of stance." Tr. pp. 242-43. After forensic nurse Morrison inquired into what had happened, J.M. stated that she had been "struck repeatedly with a belt." Tr. p. 244. Forensic nurse Morrison observed that J.M. suffered from severe bruising. She documented the bruising by depicting the injuries on a body map because

4

"there were too many bruises" to describe in a narrative form. Tr. p. 270. In addition to severe bruising from her waist to her ankles, J.M. also suffered soreness in her head, neck, and scalp. In light of the severity of J.M.'s injuries, forensic nurse Morrison ordered tests to make sure that J.M. was not suffering from internal injuries to her kidneys or lungs. Based on her observations of and discussion with J.M., forensic nurse Morrison made J.M. a "no information" patient, meaning that Methodist would not release information about J.M.'s hospitalization to incoming callers.

On April 22, 2013, Appellant-Plaintiff the State of Indiana (the "State") charged Ward with five counts: (1) Class B felony criminal confinement, (2) Class C felony battery, (3) Class C felony intimidation, (4) Class A misdemeanor domestic battery, and (5) Class A misdemeanor battery. The State subsequently requested and was granted permission to amend the charging information to include an additional charge of Class C felony battery.

On July 30, 2013, Ward filed a motion to exclude the testimony of J.M. because J.M. failed to appear for a scheduled deposition. On August 6, 2013, the State responded to Ward's motion, stating that Ward's motion should be denied because J.M. was classified as a missing person and therefore did not have notice of the scheduled deposition. The trial court denied Ward's motion on or about August 13, 2013.

On September 13, 2013, the State provided notice of its intent to introduce J.M.'s statements regarding the identity of her attacker through the testimony of the medical personnel who treated J.M., including paramedic Hodge-McKinney and forensic nurse Morrison. Following a hearing on the State's request, the trial court granted the State

5

permission to introduce J.M.'s statements regarding the identity of her attacker through the testimony of paramedic Hodge-McKinney and forensic nurse Morrison.

On December 4, 2013, the trial court conducted a bench trial. During trial, paramedic Hodge-McKinney and forensic nurse Morrison testified, over Ward's objection, that J.M. identified Ward as her attacker. Paramedic Hodge-McKinney and forensic nurse Morrison also testified about the extensive bruising to J.M.'s lower body, the severe pain suffered by J.M., and the concern for internal injuries, *i.e.*, injuries to J.M.'s abdomen, kidneys, and lungs. Following the presentation of the State's evidence, the trial court, on Ward's motion, dismissed the count alleging that Ward had committed Class B felony criminal confinement. The trial court subsequently found Ward guilty of the remaining charges.

On December 18, 2013, the trial court entered a judgment of conviction against Ward for one count of Class C felony battery and one count of Class A misdemeanor domestic battery. The trial court sentenced Ward to four years for Class C felony battery and one year for Class A misdemeanor domestic battery. The trial court ordered that the sentences would run concurrently, for an aggregate term of four years. The trial court did not enter a judgment of conviction or impose a sentence as to the remaining charges due to double-jeopardy concerns. This appeal follows.

## DISCUSSION AND DECISION

### I. Admission of Evidence

Ward contends that the trial court abused its discretion in admitting certain evidence at trial. Although Ward originally challenged the admission of the evidence through a pre-trial

6

motion to exclude the evidence, he appeals following a completed trial and challenges the

admission of such evidence at trial.

> "Thus, the issue is ... appropriately framed as whether the trial court abused its
> discretion by admitting the evidence at trial." *Washington v. State*, 784 N.E.2d
> 584, 587 (Ind. Ct. App. 2003). We have indicated that our standard of review
> of rulings on the admissibility of evidence is essentially the same whether the
> challenge is made by a pre-trial motion … or by trial objection. *Ackerman v.
> State*, 774 N.E.2d 970, 974-75 (Ind. Ct. App. 2002), *trans. denied*. We do not
> reweigh the evidence, and we consider conflicting evidence most favorable to
> the trial court's ruling. *Overstreet v. State*, 724 N.E.2d 661, 663 (Ind. Ct. App.
> 2000), *trans. denied*. However, we must also consider the uncontested
> evidence favorable to the defendant. *See id*.

*Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005) (first ellipsis in original, second

ellipsis added).

Specifically, Ward claims that the trial court abused its discretion in admitting J.M.'s

statements that Ward was the person who had battered her. J.M. did not testify at trial.

Instead, her statements regarding the identity of her attacker were admitted through the

testimony of paramedic Hodge-McKinney and forensic nurse Morrison. We note that Ward

does not contest the admissibility of the challenged evidence on hearsay grounds but rather

claims that admission of the challenged evidence violated his constitutional right to

confrontation.

### A. The Right to Confrontation

> The confrontation rights guaranteed by the Indiana Constitution and the
> federal Constitution differ to some degree. The Sixth Amendment provides:
> "In all criminal prosecutions, the accused shall enjoy the right ... to be
> confronted with the witnesses against him...." General agreement exists that
> the essential purpose of the Sixth Amendment right of confrontation is to
> insure that the defendant has the opportunity to cross-examine the witnesses
> against him. [*State v. Owings*, 622 N.E.2d 948, 950 (Ind. 1993)]. In Indiana,

criminal defendants have an independent right of confrontation arising from [A]rticle 1, [S]ection 13, of the Indiana Constitution which provides: "In all criminal prosecutions, the accused shall have the right ... to meet the witnesses face to face...." The Indiana clause contains both the right to cross-examination and the right to meet the witnesses face-to-face in the courtroom during trial. [*Brady v. State*, 575 N.E.2d 981, 988 (Ind. 1991)]. Thus, Indiana's right of confrontation can be said to encompass the federal right which only guarantees an opportunity to cross-examine witnesses. *See id*.

*Gardner v. State*, 641 N.E.2d 641, 643-44 (Ind. Ct. App. 1994) (ellipses in original).

Review of the record demonstrates that while Ward referred to both the federal and Indiana constitutions in contesting the admissibility of the challenged evidence, Ward only argued that the challenged evidence violated the protections set forth in the Sixth Amendment. He did not make a separate argument relating to the additional protections provided in Article I, Section 13. In *Davenport v. State*, we noted that "[a]bsent a clear invocation of a violation of rights under the Indiana Constitution and cogent supporting argument, we will assume that defendant raises only a claim under the United States Constitution and will analyze that claim as we would a federal constitutional claim." 734 N.E.2d 622, 626 n.2 (Ind. Ct. App. 2000) (citing *Smith v. State,* 689 N.E.2d 1238, 1240 n.3 (Ind. 1997)). Because Ward failed to make a clear invocation of or provide cogent supporting argument relating to the additional protections provided by Article I, Section 13, we will assume for the purpose of this appeal that Ward only raised a Sixth Amendment claim at trial and will review the trial court's actions accordingly.

### B. Whether Admission of the Challenged Evidence Violated Ward's Right to Confront Witnesses

In *Davis v. Washington*, the United States Supreme Court held that the Confrontation

Clause applies only to testimonial hearsay. 547 U.S. 813, 823-24 (2006). Thus, in order to determine whether the admission of J.M.'s statements to paramedic Hodge-McKinney and forensic nurse Morrison violated Ward's confrontation rights we must first determine whether the statements were "testimonial" in nature.

To determine whether a statement is testimonial, we must decide whether it was procured with "a primary purpose of creating an out-of-court substitute for trial testimony." *Turner v. State*, 953 N.E.2d 1039, 1055 (Ind. 2011) (quoting *Michigan v. Bryant*, --- U.S. ---- , 131 S.Ct. 1143, 1155 (2011)). "Where no such primary purpose exists, the admissibility of a statement is a concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, --- U.S. at ----, 131 S.Ct. at 1155. Stated differently, in assessing whether J.M.'s statements to paramedic Hodge-McKinney and forensic nurse Morrison were "testimonial" for purposes of the Sixth Amendment, "the question is: what, objectively speaking, was the primary purpose of [paramedic Hodge-McKinney's and forensic nurse Morrison's] examination[s] and [J.M.'s] statements incident thereto?" *Perry v. State*, 956 N.E.2d 41, 52-53 (Ind. Ct. App. 2011).

We have previously considered whether statements made to emergency medical personnel by the victim of domestic abuse regarding the identity of her attacker were testimonial in nature. In *Perry*, a victim of domestic abuse made statements to a treating medical professional in which she described her physical attack and identified her attacker. *Id.* at 56. The medical professional testified that the victim's statements regarding the attack and attacker were pertinent to her treatment of the victim because it enabled her to create an

9

effective treatment plan for the victim. *Id.* Upon review, we concluded that the totality of the circumstances, viewed objectively, indicated that the primary purpose of the examination of the victim by the medical professional and the victim's statements to the medical professional were to furnish and receive emergency medical and psychological care. *Id.* As a result, the victim's statements were not testimonial.[1] *Id.*

The facts of the instant matter provide that when paramedic Hodge-McKinney initiated her treatment of J.M., J.M. was in her mother and step-father's home. According to paramedic Hodge-McKinney, it is important for a paramedic who treats a victim who has suffered physical injury to identify the cause of the injuries, including the attacker, because the paramedic needs to establish that the victim is safe. In the instant matter, it seems

---

[1] In coming to this determination, we cited with approval to cases from numerous jurisdictions which held that the primary purpose of questioning by medical personnel during initial treatment or an emergency room examination serves a health-care-related function. *See State v. Slater*, 939 A.2d 1105, 1118 (Conn. 2008) (providing that although medical personal were required to administer a rape kit to collect and preserve physical evidence during a medical examination of a victim following a reported sexual assault, the requirement to do so did not eviscerate the medical treatment purpose of the exam for the victim); *State v. Schaer*, 757 N.W.2d 630, 637 (Iowa 2008) (providing that the victim's statements to emergency room personnel were not testimonial despite the fact that hospital personnel informed law enforcement of the victim's assault because there was no indication in the record of any relationship between the emergency room personnel and law enforcement that would support a finding that the medical providers' questioning of the victim as to the cause of her injuries was "a substitute for police interrogation at the station house"); *State v. Krasky*, 736 N.W.2d 636, 641-43 (Minn. 2007) (concluding that the victim's statements to the medical provider were not testimonial because the primary purpose of the victim's statements to the medical provider were to assess and protect the victim's health and welfare); *People v. Cage*, 155 P.3d 205, 218 (Cal. 2007) (providing that the victim's identification of the perpetrator to the emergency room doctor was not testimonial because emergency room doctor's sole objective in asking the victim "what happened" was to determine, in accordance with his standard medical procedure, the exact nature of the wound, and thus the correct mode of treatment); *State v. Stahal*, 855 N.E.2d 834, 846 (Ohio 2006) (providing that a reasonable person would consider questioning by a medical professional during an emergency room examination to serve a primarily health-care-related function); *Clark v. State*, 199 P.3d 1203, 1213 (Alaska Ct. App. 2009) (concluding that, taking into account the pertinent circumstances, the victim's statements to emergency room personnel were not testimonial as they shared the primary purpose of obtaining/providing proper medical care for the victim); *State v. Sandoval*, 154 P.3d 271, 273-74 (Wash. Ct. App. 2007) (providing that a statement of fault in domestic violence cases made to medical personnel by the victim when seeking treatment are not testimonial when the identity of an abuser may affect the victim's treatment).

10

reasonable that paramedic Hodge-McKinney would be concerned about the identity of J.M.'s attacker while providing treatment to J.M. at her mother and step-father's home prior to transporting J.M. to the hospital. This is especially true as the identity could potentially impact both paramedic Hodge-McKinney's and J.M.'s safety if either J.M.'s mother or step-father were the party responsible for J.M.'s injuries.

The identity of the attacker can also reasonably be considered to be important to forensic nurse Morrison's treatment of J.M. Specifically, forensic nurse Morrison testified at trial that when treating abuse cases, it is "critically important" to determine who attacked a patient because after making sure that the patient is stabilized, "a large part of the forensic nurse[']s job is to collaborate with social work and the patient in order to ensure [a] safety plan for that person if they are well enough to be discharged." Tr. pp. 235, 234. Forensic nurse Morrison explained that the safety plan would be much different for a patient attacked by a stranger than a patient attacked by someone with whom they have an ongoing relationship. Forensic nurse Morrison also explained that it is important to determine the identity of the attacker in order to assess the patient's psychological and emotional state, which can have a substantial impact on the patient's ability to care for herself following discharge.

In light of the above-stated facts, we conclude that, as in *Perry*,[2] the totality of the

---

[2] We note that in objecting to paramedic Hodge-McKinney's and forensic nurse Morrison's testimony that J.M. identified Ward as her attacker, Ward appeared to recognize that this testimony was admissible in light of our opinion in *Perry*. Ward did not differentiate the holding of *Perry* from the instant matter but rather merely requested that the trial court abrogate *Perry*. The trial court denied this request and made its ruling regarding the admissibility of the challenged evidence in accordance with the holding of *Perry*.

circumstances, viewed objectively, indicate that the primary purposes of the examinations of

J.M. by paramedic Hodge-McKinney and forensic nurse Morrison, during which J.M. made

the challenged statements regarding the identity of her attacker, were to furnish emergency

medical care to J.M. As such, J.M.'s statements were not testimonial. Because J.M.'s

statements were not testimonial, the Confrontation Clause does not apply. *See Davis*, 547

U.S. at 823-24.

## II. Sufficiency of the Evidence

Ward also contends that the evidence is insufficient to sustain his conviction for Class

C felony battery. Initially we note that Ward does not challenge the sufficiency of the

evidence to sustain the determination that he battered J.M. Ward merely claims that the

evidence is insufficient to prove that the belt used during the commission of the battery

constituted a deadly weapon.

> When reviewing the sufficiency of the evidence to support a conviction,
> appellate courts must consider only the probative evidence and reasonable
> inferences supporting the verdict. It is the fact-finder's role, not that of
> appellate courts, to assess witness credibility and weigh the evidence to
> determine whether it is sufficient to support a conviction. To preserve this
> structure, when appellate courts are confronted with conflicting evidence, they
> must consider it most favorably to the trial court's ruling. Appellate courts
> affirm the conviction unless no reasonable fact-finder could find the elements
> of the crime proven beyond a reasonable doubt. It is therefore not necessary
> that the evidence overcome every reasonable hypothesis of innocence. The
> evidence is sufficient if an inference may reasonably be drawn from it to
> support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations

omitted). "In essence, we assess only whether the verdict *could* be reached based on

12

reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002).

Indiana Code section 35-42-2-1 provides that "[a] person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a Class B misdemeanor." "However, the offense is … a Class C felony if it results in serious bodily injury to any other person or if it is committed by means of a deadly weapon." Ind. Code § 35-42-2-1. An object can be considered a deadly weapon if the object, in the manner it is used, could ordinarily be used, or is intended to be used, is readily capable of causing serious bodily injury. Ind. Code § 35-31.5-2-86. Serious bodily injury is defined as "bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus." Ind. Code § 35-31.5-2-292.

> The question of whether a weapon is "deadly" is determined from a description of the weapon, the manner of its use, and the circumstances of the case. *Merriweather v. State*, 778 N.E.2d 449, 457 (Ind. Ct. App. 2002). Whether an object is a deadly weapon based on these factors is a question of fact. *Miller v. State*, 500 N.E.2d 193, 197 (Ind. 1986). The original purpose of the object is not considered. Rather, the manner in which the defendant actually used the object is examined. *Timm v. State*, 644 N.E.2d 1235, 1238 (Ind. 1994). Also, it does not matter if actual injuries were sustained by the crime victim, provided the defendant had the apparent ability to injure the victim seriously through his use of the object during the crime. *Miller*, 500 N.E.2d at 196-97.

*Gleason v. State*, 965 N.E.2d 702, 708 (Ind. Ct. App. 2012).

In *Timm*, 644 N.E.2d 1235, 1238 (Ind. 1994), the Indiana Supreme Court determined that under the circumstances presented, the evidence was sufficient to support the fact-finder's determination that a long-handled plastic flashlight qualified as a deadly weapon. 644 N.E.2d at 1238. In other cases, the Indiana Supreme Court has also found that the evidence was sufficient to sustain the fact-finder's determination that the following items qualified as deadly weapons: a screwdriver, a large rock, a stapler, chunks of porcelain, and a soft drink bottle. *See Miller*, 500 N.E.2d at 197 (Ind. 1986) (screwdriver); *Majors v. State*, 274 Ind. 261, 263, 410 N.E.2d 1196, 1197 (1980) (large rock); *Cummings v. State*, 270 N.E.2d 251, 254, 384 N.E.2d 605, 606 (1979) (stapler); *Liston v. State*, 252 Ind. 502, 507, 250 N.DE.2d 739, 741 (1969) (chunks of porcelain); *Short v. State*, 234 Ind. 17, 23-24, 122 N.E.2d 82, 86 (1954) (soft drink bottle). In addition, in *Gleason*, we determined that, under the circumstances, the evidence was sufficient to sustain the fact-finder's determination that brass knuckles qualified as a deadly weapon. 965 N.E.2d at 708.

In the instant matter, the record demonstrates that Ward used a leather belt to repeatedly strike J.M. As a result of Ward's actions, J.M. suffered welts and serious bruising from her waist to her ankles, as well as severe pain. During an initial examination by paramedic Hodge-McKinney, J.M. indicated that she was "in the most pain she'[d] ever felt in her life." Tr. p. 218. Paramedic Hodge-McKinney determined that the bruise marks were consistent with J.M.'s claim that she had been struck repeatedly with a belt.

In addition to the serious bruising and serious pain, paramedic Hodge-McKinney

14

testified that J.M. was at risk for suffering serious internal injuries. Paramedic Hodge-McKinney explained that internal injuries, including injuries to one's kidneys, is "possible when you are hit hard enough to where it causes those types of bruises." Tr. p. 216. Paramedic Hodge-McKinney further explained that potential internal injuries could have been fatal if, given the apparent force behind Ward's attack on J.M., the strikes from the belt had ruptured an organ in J.M.'s abdominal area. Forensic nurse Morrison also testified that, given the extent of J.M.'s injuries, she was concerned about the potential for damage to J.M.'s internal organs, such as her kidneys, liver, or lungs because injuries to these organs could, without treatment, potentially result in death.

Given the serious nature of J.M.'s injuries and the severe pain suffered by J.M., we cannot say that the evidence was insufficient to sustain the trial court's determination that the belt used during the commission of the battery qualified as a deadly weapon. Ward's claim to the contrary amounts to nothing more than a request for this court to reweigh the evidence, which we will not do. *See Stewart*, 768 N.E.2d at 435.

**CONCLUSION**

In sum, we conclude that the trial court did not abuse its discretion in admitting the challenged evidence. We also conclude that the evidence is sufficient to sustain Ward's conviction for Class C felony battery. Accordingly, we affirm.

The judgment of the trial court is affirmed.

BARNES, J., and BROWN, J., concur.

15