ATTORNEY FOR APPELLANT
Karen Celestino-Horseman
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

_____

# In the
# Indiana Supreme Court



FILED
Feb 19 2016, 11:37 am
CLERK
of the supreme court,
court of appeals and
tax court

_____

No. 49S02-1602-CR-96

DEE WARD,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

_____

Appeal from the Marion Superior Court Criminal Division 6, No. 49G06-1304-FB-025434
The Honorable Jeffrey Marchal, Commissioner

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1401-CR-25

_____

**February 19, 2016**

**Rush, Chief Justice.**

Dee Ward was charged with battering J.M., his girlfriend. During treatment for her injuries, J.M. told a paramedic and a forensic nurse that Ward was her attacker. When J.M. failed to appear for depositions or to testify at trial, the State relied on her statements to the paramedic and the forensic nurse to implicate Ward, over Ward's objection that the evidence was "testimonial hearsay" that violated his federal and State confrontation rights.

We hold the statements are non-testimonial. Asking J.M. who attacked her was not aimed at obtaining a substitute for trial testimony—rather, it was a vital part of providing appropriate medical and psychological treatment and service referrals, as the applicable standard of care requires. Accordingly, J.M.'s hearsay statements were properly admitted into evidence. We therefore affirm Ward's convictions for C-felony battery and A-misdemeanor domestic battery.

**Facts and Procedural History**

As of April 2013, Ward and J.M. had been dating and living together off and on for about two years and had a child together. During that time, J.M. also sometimes lived with her mother and step-father. Ward visited the parents' home often, and they were familiar with his truck.

On the afternoon of April 10, 2013, J.M.'s step-father saw Ward's pick-up truck pull in front of his house. J.M. got out from the passenger side walking "very gingerly," Tr. 144, and then the truck sped away. J.M. was hanging her head and crying as she came into the house. When her step-father asked what was wrong, J.M. responded, "I'm hurt" and "Where's mom?" Tr. 147. J.M. pulled down her pants to show her mother her buttocks and legs which revealed welts and bruising. Mother escorted J.M. to her bedroom and—over J.M.'s protests—told her step-father to call 911.

At about 2:24 p.m., paramedic Linda Hodge-McKinney ("the Paramedic") received an "[a]ssault trauma" dispatch and arrived at the scene about three minutes later. Tr. 195. The Paramedic found J.M. lying on a bed in a fetal position crying, with extensive bruising on her body. When the Paramedic asked J.M. to rate her pain "[o]n a scale of one to ten, with . . . ten being the most amount of pain you've ever been in," J.M. rated her pain a ten. Tr. 205–06. A police officer who arrived shortly after the paramedics also observed "[m]assive bruising, basically all over her body especially her legs and buttocks, welts, dark blue and black bruises. Pretty severe." Tr. 161. After the officer left the room, Tr. 162, J.M. advised the Paramedic that her boyfriend "Dee" was the source of her injuries, Tr. 204.

Concerned that J.M. may have suffered internal injuries, the Paramedic transported J.M. to a local hospital, administering intravenous pain medication along the way. Tr. 243. At the emergency room, forensic nurse Julie Morrison ("the Forensic Nurse") treated J.M., observing that she was "obviously in a lot of discomfort" and "rolled up in a ball . . . in a near fetal position on one side, all hunched over, sort of in a protective sort of stance." Tr. 242–43. When the Forensic

2

Nurse asked what happened, J.M. stated that she had been "struck repeatedly with a belt," Tr. 244, and that "it was her boyfriend Dee Ward" who beat her, Tr. 266. Meanwhile, the Forensic Nurse oversaw J.M.'s safety and discharge planning, classifying J.M. as a "no information patient" to prevent people (specifically the attacker) from learning her whereabouts. Tr. 290–91. Further examination and testing ruled out internal injuries, and J.M. was discharged to her parents' home later that evening with referrals to two domestic-violence support organizations, a recommendation for counseling, a prescription for pain medication, and instructions for minimizing the swelling. Tr. 56–58; State's Ex. 14, Ex. Confidential Vol. at 100–01.

The State initially charged Ward with B-felony criminal confinement, C-felony battery, C-felony intimidation, and A-misdemeanor battery and domestic battery. It later amended the charging information to include a second count of C-felony battery.

Ward filed a motion to exclude J.M.'s testimony, after she twice failed to appear for scheduled depositions. The State responded that J.M. did not have notice of the scheduled depositions because she had been reported missing shortly after the assault and was classified as a missing person. The trial court denied Ward's motion. Over a month later, noting that J.M. was still a missing person and efforts by law enforcement to locate her had been unsuccessful, the State provided notice of intent to introduce J.M.'s statement identifying Ward as her attacker through the testimony and records of the Paramedic and the Forensic Nurse. Following a pretrial hearing, the trial court granted that motion.

At a bench trial, the trial court dismissed the criminal confinement charge on Ward's motion, but found him guilty of the remaining charges. At sentencing, because of double jeopardy concerns, the trial court entered judgment of conviction on one count of C-felony battery and one count of A-misdemeanor domestic battery, then sentenced Ward to concurrent terms of four years and one year, respectively.

Ward appealed, arguing in part that J.M.'s statements were testimonial hearsay in violation of his confrontation rights under the Sixth Amendment and Article 1, Section 13 of the Indiana Constitution. The Court of Appeals held that Ward waived his Indiana constitutional claim by failing to separately argue that issue to the trial court, and that the challenged statements were non-testimonial and therefore did not violate the Sixth Amendment. Ward v. State, 15 N.E.3d 114, 119,

3

121 (Ind. Ct. App. 2014). We now grant transfer, thereby vacating the opinion of the Court of Appeals.[1] See Ind. Appellate Rule 58(A)(2). Additional facts are set forth below.

## Discussion

### I. Ward Properly Preserved His State Constitutional Claim.

Before we can address Ward's Indiana constitutional claim, we must first address the State's threshold argument that Ward has waived this claim for appellate review—asserting that his "objections to the evidence *were not* based upon the Indiana Constitution, but rather upon the federal constitution." Br. of Appellee at 12.

The State is, quite simply, mistaken—Ward expressly invoked both Constitutions in his objections. His hearsay objection to the Paramedic's testimony specifically cited both "Sixth Amendment" grounds and the "face to face" requirement under "Article 1, Section 13." Tr. 200, 202. (Indeed, when the State retorted that the court had "already ruled on this" at a "preliminary hearing," the trial court recognized exactly what Ward was doing: "He's wanting to preserve his objection for the record." Tr. 201.) Likewise, when the State asked the Forensic Nurse what J.M. said about the cause of her injuries, Ward interjected, "I'm going to object to this as impermissible and testimonial hearsay under [the] Sixth Amendment, [and] Article 1, Section 13 of the Indiana Constitution." Tr. 244–45. Ward clearly raised both state and federal constitutional grounds for his objection.

The State further relies on Davenport v. State, 734 N.E.2d 622 (Ind. Ct. App. 2000), for the proposition that "[a]bsent a clear invocation of a violation of rights under the Indiana Constitution and cogent supporting argument, we will assume that defendant raises only a claim under the United States Constitution and will analyze that claim as we would a federal constitutional claim." Br. of Appellee at 13 (quoting Davenport, 734 N.E.2d at 624 n.2). But Davenport addresses the standard by which appellate counsel is measured, not trial counsel. See Ind. App. R. 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning."); see also Potter v. State, 684 N.E.2d 1127, 1136

---

[1] Ward also argued on direct appeal that the evidence was insufficient to support his C-felony battery conviction. We summarily affirm the Court of Appeals' rejection of that claim.

n.5 (Ind. 1997) (referring to the lack of a separate argument under the Indiana Constitution in the appellant's brief).

By contrast, Indiana Evidence Rule 103(a) governs how to preserve a claim of error at trial:

> A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and:
>
> (1) if the ruling admits evidence, a party, on the record:
>
> (A) timely objects or moves to strike; and
>
> (B) states the specific ground, unless it was apparent from the context.

Ind. Evidence Rule 103(a). As we have explained, that standard requires only "a contemporaneous objection 'that is sufficiently specific to alert the trial judge fully of the legal issue.'" Raess v. Doescher, 883 N.E.2d 790, 797 (Ind. 2008) (quoting Moore v. State, 669 N.E.2d 733, 742 (Ind. 1996)). It would be unrealistic to insist on detailed doctrinal arguments during the exigencies of trial—and indeed, long-winded objections are a poor use of court and jury time. The aim is simply to let the trial judge make an informed decision and prevent the objecting party from switching theories on appeal. Ward's trial-level objections amply met the Rule 103(a) standard and therefore preserved his Indiana constitutional claim.

## II. Indiana Guarantees "Face to Face" Confrontation Only of "Witnesses," Not Declarants.

We now turn to the merits of Ward's Indiana constitutional claim. He invokes Article 1, Section 13 of the Indiana Constitution, which provides in relevant part: "In all criminal prosecutions, the accused shall have the right . . . to meet the witnesses face to face . . . ." Indiana's right to a face-to-face meeting is, "[t]o a considerable degree, . . . co-extensive" with the federal confrontation right. Brady v. State, 575 N.E.2d 981, 987 (Ind. 1991). But while the language of Indiana's provision "has much the same meaning and history as that employed in the Sixth Amendment, it has a special concreteness and is more detailed." Id.

Still, the "face to face" language "has not always been interpreted literally. Otherwise, the testimony of all absent witnesses, whether unavailable through death or illness or threat, would never be admissible at trial." Miller v. State, 517 N.E.2d 64, 71 (Ind. 1987), superseded by statute

on other grounds. As this Court declared in <u>Pierce v. State</u>, "in the case of typical hearsay where a live witness reports what the declarant said the constitutional reference to meeting the 'witness' is literally fulfilled because the witness reporting the hearsay is on the stand." 677 N.E.2d 39, 49 (Ind. 1997). In other words, "in that situation the declarant is not the witness." <u>Id.</u> And so it goes here. The witnesses recounting J.M.'s out-of-court statements were the Paramedic and the Forensic Nurse, both of whom testified under oath and whom Ward confronted face to face. Ward's Indiana constitutional right of confrontation was therefore not violated.

### III. The Federal Constitution Bars Only "Testimonial" Hearsay; Statements Made Primarily for a Non-Testimonial Purpose Do Not Violate the Confrontation Clause.

A. *Hearsay does not violate the Confrontation Clause if its "primary purpose" is non-testimonial.*

The Confrontation Clause of the Sixth Amendment to the United States Constitution, which is made applicable to the States by the Fourteenth Amendment, provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. In <u>Crawford v. Washington</u>, the United States Supreme Court explained that "witnesses" under the Confrontation Clause are those "who bear testimony," and the Court defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." 541 U.S. 36, 51 (2004) (internal quotations and alterations omitted) (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). The Court concluded that the Sixth Amendment prohibits the introduction of testimonial statements by a non-testifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." <u>Id.</u> at 54. Applying that definition to the facts in <u>Crawford</u>, the Court held that statements by a witness during police questioning at the station house were testimonial and thus could not be admitted. <u>Id.</u> at 67–68. However, the Court did not provide an exhaustive definition of "testimonial" statements. <u>Id.</u> at 68. Rather, it declared that the label "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." <u>Id.</u>

In <u>Davis v. Washington</u> and <u>Hammon v. Indiana</u>, which were decided together, the United States Supreme Court further refined what it means for a statement to be deemed "testimonial." 547 U.S. 813 (2006). Both cases involved statements given to law enforcement officers by victims of

domestic violence. The victim in Davis made statements to a 911 emergency operator during and shortly after her boyfriend's brutal assault. Id. at 817–18. In Hammon, after being isolated from her abusive husband, the victim made statements to police that were memorialized in a "battery affidavit." Id. at 820. The Court held that statements in Hammon were testimonial, while the statements in Davis were not. Announcing what has come to be known as the "primary purpose" test, the Court explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Id. at 822. Because both cases involved statements to law enforcement officers, the Court reserved the question of whether similar statements to persons other than law enforcement officers would raise similar Confrontation Clause concerns. See id. at 823 n.2.

The Court elaborated further on the "primary purpose" test in Michigan v. Bryant— reiterating that "what Davis meant by 'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency,'" but also recognizing that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." 562 U.S. 344, 358–59 (2011) (quoting Davis, 547 U.S. at 822). The "existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry." Id. at 374. Rather, "whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." Id. at 366. Applying these principles in Bryant, the Court held that statements made by a dying victim about his assailant were not testimonial because the circumstances objectively indicated that the conversation was primarily aimed at addressing an ongoing emergency, not establishing evidence for trial. Id. at 377–78. And because the relevant statements were made to law enforcement officers, the Court again declined to resolve the question of "whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" Id. at 357 n.3 (quoting Davis, 547 U.S. at 823 n.2).

7

Courts across the country have struggled to determine whether statements made to non-law enforcement personnel could be testimonial. Some asked whether the interview more closely resembled the police interviews in Crawford and Hammon than the 911 call in Davis, see, e.g., Hartsfield v. Commonwealth, 277 S.W.3d 239, 244 (Ky. 2009) ("In the case at bar, the interview of M.B. by the . . . nurse bears more similarity to a police interview, as in Crawford and Hammon, than to the questioning conducted in the 911 call in Davis.")—or similarly, whether an objective person would believe the questioner is an agent of the government, see State v. Snowden, 867 A.2d 314, 327 n.17 (Md. 2005) (finding "that where an objective person in the position of the declarant would be aware that the statement-taker is an agent of the government, governmental involvement is a relevant, and indeed weighty, factor in determining whether any statements made would be deemed testimonial in nature"). Some considered on a case-by-case basis whether the circumstances surrounding the statements "would lead an objective witness to reasonably believe that the statements would be available for use at a later trial." Medina v. State, 143 P.3d 471, 474 (Nev. 2006); see also Gov't of Virgin Islands v. Vicars, 340 F. App'x 807, 807–08 (3d Cir. 2009). Still others analyzed individual questions and answers to determine when the "inquiries transitioned from those made as a medical professional for medical diagnosis and treatment to those made by an agent of the State for the purpose of providing evidence for use in a later prosecution." State v. Miller, 264 P.3d 461, 487 (Kan. 2011); see also United States v. Santos, 589 F.3d 759, 763 (5th Cir. 2009). And finally, a number of jurisdictions—including Indiana—employed the "primary purpose" framework announced in Davis and Bryant when evaluating whether statements by non-police actors—especially medical personnel—were testimonial. See Perry v. State, 956 N.E.2d 41, 53–56 (Ind. Ct. App. 2011) (collecting and citing cases).

But recently in Ohio v. Clark, 135 S. Ct. 2173 (2015), the United States Supreme Court answered the question it had repeatedly reserved—whether statements to persons other than law enforcement officers are subject to the Confrontation Clause. The Court restated the "primary purpose test" as "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" Id. at 2180 (alteration in original) (citing Bryant, 562 U.S. at 358). Clark's analysis began with the proposition that under the primary purpose test, statements to nurses, doctors, and other non-law enforcement officers are "much less likely to be testimonial than statements to law enforcement officers." Id. at 2181. It emphasized that trial "[c]ourts must evaluate challenged statements in context, and part

of that context is the questioner's identity." Id. at 2182. Indeed, context is "highly relevant." Id. For example, the domestic violence victim in Clark named his attacker when questioned by his teacher. Id. at 2177. Because the context of "the relationship between a student and his teacher is very different from that between a citizen and the police," the Court found the victim's statements non-testimonial. Id. at 2182.

B. *J.M.'s statements to the Paramedic and Forensic Nurse, identifying Ward as her attacker, were for the "primary purpose" of medical treatment, and thus are non-testimonial.*

In essence, Clark clarified that determining the "primary purpose" of statements made to non-law enforcement personnel—that is, whether it was intended to be available as a substitute for trial testimony in a later criminal prosecution—is highly fact-sensitive. That approach is consistent with Perry and Indiana's other pre-Clark cases addressing Confrontation Clause questions about identification statements made during medical treatment. Those cases scrutinized identity statements in context to discern whether their primary purpose was testimonial, which is essentially the approach Clark prescribes. Perry recognized that "[s]tatements attributing fault or establishing a perpetrator's identity are typically inadmissible under the medical diagnosis [and treatment] exception"—but also recognized an exception to that general rule "in cases involving child abuse, sexual assault, and/or *domestic violence*." 956 N.E.2d at 49 (emphasis added). In essence, Perry reasoned that because of the unique nature of those cases, identifying the attacker serves a primarily *medical*, not testimonial, purpose because a "physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household." Id. (quoting Nash v. State, 754 N.E.2d 1021, 1025 (Ind. Ct. App. 2001)).

1. The Paramedic

Here, the record shows that when the Paramedic arrived on the scene, she encountered J.M. lying on a bed in a fetal position, crying, and in severe pain. Her body revealed extensive bruising. The Paramedic asked J.M. what happened to her, and she responded that she "was at her boyfriend's house and he made her stay the night and from about 3:00 in the morning to 6:00 in the morning he beat her with a belt and wouldn't let her leave." Tr. 202. When questioned by the State on the purpose of asking J.M. what happened to her, the Paramedic responded: "For one thing, to find out why we were called out to the house, why were we there for her. She is lying on the

bed whimpering, crying, so I need to know what happened and what she needs for us to do for her today." Tr. 199. The State also inquired, "[i]s it important to determine who caused the injuries to the patient you are treating," to which the Paramedic responded, "[i]t is for us at that time. Because like I said before, I need to know if they are still there or if they are anywhere around to cause any more harm." Tr. 194. Responding to the State's further inquiry, the Paramedic testified that J.M. said her boyfriend's name was Dee. Tr. 204–05.

Considering the relevant circumstances, it does not appear to us that the primary purpose of the Paramedic's questioning of J.M. was to create an out-of-court substitute for trial testimony. Ward argues that the Paramedic was not responding to an ongoing emergency because he carried out his assault several hours earlier. See Pet. to Trans. at 8–9.[2] But as Bryant makes plain, "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." 562 U.S. at 358. Here, the Paramedic's priority was to treat an obviously battered victim who apparently was suffering in pain. The Paramedic never told J.M. that her answers might be used to arrest or punish her abuser; J.M. never hinted that she intended her statements for that purpose (and was likely in no condition to form such an intent, given the pain she was in); and the conversation was informal—a far cry from "the formalized station-house questioning in Crawford or the police interrogation and battery affidavit in Hammon." Clark, 135 S. Ct. at 2181. In sum, J.M.'s statements to the Paramedic were non-testimonial and therefore unobjectionable on Confrontation Clause grounds.

2. The Forensic Nurse

We likewise find J.M.'s statements to the Forensic Nurse to be non-testimonial. As Perry illustrates, medically relevant information is not transformed into "testimony" when it is reported to a *forensic* nurse instead of a paramedic. In Perry, a rape victim consented to a forensic exam, executing a boilerplate form much like the one here. 956 N.E.2d at 48. During the exam, she described the attack and named her attacker, and the forensic nurse included the name in the

---

[2] Though we need not reach the merits of Ward's argument that there was no longer an emergency, we note a significant problem with his claim. J.M.'s delay in obtaining treatment was of Ward's own making—he "wouldn't let her leave" after the attack, Tr. 202, until leaving her at her parents' doorstep hours later. And even then, she was still visibly traumatized, and the Paramedic was concerned about internal injuries. We are skeptical that Ward, by holding J.M. captive, negated any "emergency"—much as we might be skeptical of the proverbial child who, having killed his parents, pleads for mercy because he is an orphan.

medical record that was admitted at trial. Id. at 46–48. The Court of Appeals recognized that despite an "investigative component," the forensic examination served the "*primary purpose . . . to furnish and receive emergency medical and psychological care*," making the victim's statements identifying her attacker admissible under the medical-diagnosis hearsay exception, and non-testimonial for purposes of the Confrontation Clause. Id. at 50, 56–57 (emphasis added). Ward argues that Perry's rationale applies only in cases involving sexual assault—but to the contrary, Perry specifically recognized that "in cases involving child abuse, sexual assault, and/or *domestic violence*," the assailant's identity is "pertinent to the diagnosis and treatment of . . . physical injuries[,] [a]nd . . . psychological counseling for *domestic abuse*, and significant to medical personnel in deciding how to discharge their patient." Id. at 49–50 (emphases added).[3]

Ward nevertheless characterizes the Forensic Nurse here as a "police collaborator," and argues that Perry did not fully contemplate such nurses' investigative role. But Perry was quite correct in recognizing that a forensic nurse's primary function is providing medical treatment, not gathering evidence. Medical scholarship confirms that identifying attackers is integral to the standard of care for "medical treatment" of domestic abuse victims. Doctors and nurses in various clinical settings—including emergency room, primary care, surgery, and mental health facilities—are instructed they "must be prepared to engage patients around the issue of I[ntimate] P[artner] V[iolence] and provide assessment *and* referral." Nancy Sugg, MD, MPH, Intimate Partner Violence: Prevalence, Health Consequences, and Intervention, 99 Med. Clin. N. Am. 629, 640

---

[3] Perry didn't broach new ground. Courts from Indiana and other jurisdictions have held that patient identification statements to medical service providers serve the purpose of medical treatment including psychological counseling, in- or out-patient referrals, follow-up plans, safety plans, and discharge plans for victims of domestic violence or other violent crimes. See, e.g., McClain v. State, 675 N.E.2d 329, 330–31 (Ind. 1996) (stating child molestation victim's identification statements made to therapist served the purpose of psychotherapy); Nash, 754 N.E.2d at 1024–25 (finding rape victim's identification statements to ER nurse serve purpose of medical treatment because treatment includes that of emotional/psychological injuries and safe discharge); U.S. v. Joe, 8 F.3d 1488, 1493–94 (10th Cir. 1993) (stating rape victim's identification statements to doctor served medical treatment because "effectiveness of the treatment received will depend upon the accuracy of the information provided to the physician," and treatment addresses psychological/emotional injuries with appropriate counseling, safe discharge, and after-care); U.S. v. Balfany, 965 F.2d 575, 579–80 (8th Cir. 1992) (declaring child sexual abuse victim's identification of attacker is important for medical treatment because identity affects the type of counseling provided during and after hospital stay); Palilonis v. State, 970 N.E.2d 713, 727 (Ind. Ct. App. 2012), trans. denied (finding rape/sexual assault victim's general identification statements to nurse are for purpose of medical treatment because treatment includes psychological counseling and proper discharge).

11

(2015) (emphasis added). Specifically, experts urge doctors and nurses to acknowledge the violence, assess patient safety, refer the victim for additional treatment or services, and document the injuries *and the abuser*. Id. at 641–44 (emphasis added).[4] Indeed, a "forensic nurse is a nurse who provides specialized care for patients who are victims and/or perpetrators of trauma (both intentional and unintentional). Forensic nurses are *nurses* first and foremost," even though they are also specially trained in injury identification, evaluation, and documentation. Int'l Ass'n of Forensic Nurses, (available at http://www.forensicnurses.org/?page=whatisfn) (last visited February 19, 2016).

By this definition, everything the Forensic Nurse did here served the primary purpose of medical treatment. When ambulance personnel alerted her of J.M.'s arrival, she examined J.M. in the emergency room. Tr. 240. She informed J.M. she worked in conjunction with J.M.'s other doctors and nurses "to make sure she is taken care of medically and she didn't have any underlying injuries that we couldn't see immediately," and J.M. consented to the examination understanding that purpose. Tr. 242. During the evaluation, the Forensic Nurse first took J.M.'s medical history in which J.M. (like the victim in Perry) described how she sustained her injuries—including naming the attacker, Tr. 242–44, 247–48, 266–68—and then she examined and documented J.M.'s injuries, Tr. 269–85. Meanwhile, she oversaw J.M.'s safety and discharge planning, Tr. 290–91, and classified J.M. as a "no information patient" to prevent people (specifically the attacker) from learning J.M.'s whereabouts, Tr. 290–91. She then ensured J.M. would be discharged to a safe location (home with

---

[4] This comprehensive process of treatment for domestic-violence victims is not just for emergency rooms or forensic nurses—it is also part of the standard of care for surgeons, primary-care providers, pediatricians, and OB-GYNs. See American College of Surgeons, Statement on Intimate Partner Violence (2014) (stating it is the treating surgeon's responsibility to care for the immediate injury and reassure the patient, but also to identify resources in his or her hospital and to help identify resources in the community); Megan H. Bair-Merritt, MD, MSCE, et. al., Primary Care-Based Interventions for Intimate Partner Violence: A Systematic Review, 46(2) Am. J. Prev. Med. 188, 192 (2014) (defining role of primary care providers as "identifying and responding to IPV"); Jonathan D. Thackeray, MD, Roberta Hibbard, MD, and M. Denise Dowd, MD, MPH, Clinical Report—Intimate Partner Violence: The Role of the Pediatrician, 125 Pediatrics 1094, 1096–98 (2010) (instructing pediatricians that intimate partner violence between parents affects children and to address it with assessments, referrals for counseling, and safety plans); Committee on Health Care for Underserved Women, The American College of Obstetricians and Gynecologists, Intimate Partner Violence, Committee Opinion Number 518, 119 Obstetrics and Gynecology 412, 415 (2012) (instructing that "[i]f the clinician ascertains that a patient is involved in a violent relationship, he or she should acknowledge the trauma and assess the immediate safety of the patient and her children while assisting the patient in the development of a safety plan" and that "[p]atients should be offered information that includes community resources (mental health services, crisis hotlines, rape relief centers, shelters, legal aid, and police contact information) and appropriate referrals").

the mother, not the attacker). Tr. 56–58; State's Ex. 14, Ex. Confidential Vol. at 100–01. Finally, the Forensic Nurse recommended counseling and made the appropriate referrals to the Julian Center and Legacy House. Tr. 56–58; State's Ex. 14, Ex. Confidential Vol. at 100–01.

The Forensic Nurse's treatment of J.M. mirrored the treatment she administers to all violence victims she sees. She "always do[es] the same thing . . . ." Tr. 232–33. She takes a medical history, asks how the injuries occurred, and performs a "head to toe" examination. Tr. 232–33. She needs to know what and who caused the injury because that information affects treatment, including safety and discharge plans, Tr. 233–34—just as Perry recognized. She explained:

> Especially, again, victims of *any* type of violence, it would be really important to know if they knew who the perpetrator was. Because a large part of the forensic nurse[']s job is to collaborate with social work and the patient in order to ensure [a] safety plan for that person if they are well enough to be discharged.
>
> * * *
>
> Your resources and safety plan would be a lot different, for instance, if you are attacked by a stranger, an unknown person in a parking garage, let's say, downtown, versus somebody who might be a family member or someone you are living with. If there is a common child, if you share a child, because there might be visitation, custody issues. So it's critically important that [the forensic nurse] can find out who that person is.

Tr. 234–35 (emphasis added). Similarly, the Forensic Nurse stated hospital protocol required her to assess a patient's psychological or emotional injuries because "[i]t has to do a lot with their ability to care for themselves once they are discharged." Tr. 235. She testified she and other forensic nurses (at her hospital and around the country) follow this process when treating patients like J.M., Tr. 235–36, because it reflects the duty of care owed to all victims of violence.

Despite Ward's arguments to the contrary, patient safety is a "critical" part of the comprehensive standard of care for treating victims of domestic violence. Sugg, 99 Med. Clin. N. Am. at 641. Providers *must* issue a safety plan. Id. at 642. And that plan is not just the final instruction a patient receives; it is a process of "assessment" that begins "[b]efore the patient leaves the office," id. at 641, with questions like "what happened?" and "who did this?" See id. at 641–42. Answering

13

these questions determines what resources patients need from their doctors and nurses—"for instance, are they safe to go home or do they need to access a domestic violence shelter?" Id. at 641. (Recall that the Paramedic who first arrived on the scene also, consistent with that standard, specifically asked J.M. what she needed from them. Tr. 202.) Likewise, proper documentation works in tandem with safety assessments and planning because it "helps coordinate care between multidisciplinary providers." Sugg, 99 Med. Clin. N. Am. at 643. Doctors and nurses are instructed to record the assailant's name and relationship to the victim if the victim divulges that information. Id. at 644.

In other words, "a hospital's duty of care to a patient who presents observable signs of domestic abuse includes some reasonable measures to address the patient's risk." McSwane v. Bloomington Hosp. & Healthcare Sys., 916 N.E.2d 906, 910 (Ind. 2009); see also id. at 912 (Rucker, J., dissenting). The standard of care for "medical treatment" of domestic abuse goes beyond physical injuries, and even beyond immediate outcomes like who takes a victim home or what medications a patient receives. Rather, it requires nurses and physicians to rely on information obtained from patients to triage their injuries—both mental and physical—and implement comprehensive treatment plans. Doctors and nurses *need* to know the identity of the perpetrator when treating a victim of domestic violence. Perry, 956 N.E.2d at 49. And specifically here, the Forensic Nurse *needed* to know who beat J.M. in order to classify her status while in the hospital (no information patient), Tr. 290–91; discharge her home to a safe place (home with her mother and not her abuser), State's Ex. 14, Ex. Confidential Vol. at 101; and make proper post-discharge referrals (follow-up counseling and referrals to Julian Center and Legacy House), Tr. 56–58; State's Ex. 14, Ex. Confidential Vol. at 100–01—all eminently reasonable measures to address J.M.'s risk.

But in order to take those reasonable measures, the Forensic Nurse needed to obtain J.M.'s informed consent. Ward emphasizes that the boilerplate consent forms used here also included an information-release provision, which permitted (but did not compel) the hospital to disclose J.M.'s information if requested by law enforcement. Tr. 62. But so did the consent form in Perry—and just as that collateral provision did not make the statement in Perry testimonial, neither should a similar provision change the outcome here. That secondary provision did not change the *primary* purpose of the exam and the information it gathered, from medical treatment to investigation.

14

Ward's reliance on the consent form for rejecting the medical "primary purpose" for J.M.'s statements gives short shrift to the medical treatment J.M. received, and gives far too much weight to that isolated provision of the informed-consent form.

Considering their context, we deem J.M.'s statements to the Forensic Nurse identifying Ward as her attacker non-testimonial, not barred by the Confrontation Clause, and properly admitted under Evidence Rule 803(4). Of course, Evidence Rule 803(4) should not be abused by asserting a pretextual medical purpose as a backdoor for admitting what is really testimonial hearsay. But that is the very problem the "primary purpose" test is designed to solve—to discern, in context, whether the asserted purpose of the statement really *is* "primary," or merely pretext for an impermissible purpose. Faithfully applying the "primary purpose" test in context, as Clark and Perry prescribe, and as we have here, will therefore guard against those abuses. There is no need to confine our view of valid "medical purposes" to treatment of only physical injuries, or information exchanged in an introduction or language in a consent form. Nor will we limit Perry to cases involving "domestic sexual assault," when Perry specifically says it applies to domestic abuse too. Indeed, the standard of care *required* the Forensic Nurse to take reasonable measures to address J.M.'s risk. The trial court correctly recognized the legitimate primary medical purpose for asking J.M. to identify her attacker and properly admitted the Forensic Nurse's testimony.

**Conclusion**

As a general matter, identifying a domestic-violence victim's attacker is integral to the medical standard of care for such cases—and nothing in the particular circumstances of this case leads us away from that conclusion. Accordingly, J.M.'s hearsay statements to the Paramedic and Forensic Nurse identifying Ward as her assailant were not testimonial, and were properly admitted into evidence. Ward's convictions are affirmed.

David and Massa, JJ., concur.

Rucker, J., dissents in part with separate opinion in which Dickson, J., concurs.

15

**RUCKER, J., dissenting in part.**

I respectfully dissent from that portion of the majority opinion declaring as non-testimonial the statements J.M. made to the Forensic Nurse identifying Ward as her attacker. It is certainly true there are circumstances under which the identity of an alleged abuser is necessary to enable medical personnel to provide appropriate diagnosis and treatment. But here the majority goes a step further and essentially takes the position that in *all* cases involving a medical care provider—no matter the facts—the identity of the alleged abuser is necessary, non-testimonial, and admissible in the face of a Sixth Amendment Confrontation Clause challenge. I cannot agree because this sets a dangerous precedent for future cases.

First, it is apparent that here the Forensic Nurse was serving in a dual capacity: obtaining information necessary for appropriate medical diagnosis and treatment as well as gathering evidence for use in a criminal prosecution. On this latter point, the record shows that upon referral to the Forensic Nurse, J.M. was presented with a "General Information" sheet. Page one contained the following "patient consent" section:

> I hereby consent to a physical examination by a specially trained Forensic Nurse Examiner to discover and *preserve evidence* of the assault.
>
> I understand that the report of the examination and *any evidence* or specimens collected *will be released to law enforcement authorities*. I also understand that I may withdraw my consent at any time for any portion of the examination.
>
> I understand that collection of evidence may include photographing and sketching of injuries. Knowing this, I consent to having photographs *taken for use as evidence*. I do consent to the use of these photographs for educational purposes.

State's Ex. 14, Ex. Confidential Vol. at 96 (emphasis added). J.M. affixed her initials next to each paragraph and then signed the form. Also included on the first page were the Forensic Nurse's signature and a social worker's name. The page also included a space for information from "Law Enforcement" including spaces for the responding officer's name, detective's name, agency, case

number, and phone number.  Id.  The case number was filled in, with a note that reads "police report made at [patient's] mother's home."  Id.  Page two included blanks for the Forensic Nurse to fill in, describing "[l]ocation and physical surroundings of assault" and the alleged assailant(s) name(s), age, gender, ethnicity, and relationship to the patient.  Id. at 97.  Pages three and four included body maps, with the Forensic Nurse's notes to indicate what type of injury was present, how the injuries were inflicted, and the identity of the assailant.  Id. at 98-99.

With respect to the Forensic Nurse's capacity as a medical caregiver the following exchange occurred:

> Q. [Deputy Prosecutor:] Now what do you tell a patient about the purpose of your examination of them, when you're doing this examination?
> A. [Forensic Nurse:]  Uh, I would introduce myself, tell them my role, tell them that I work in conjunction with their physician as a specially trained nurse to help evaluate any type of injuries that they might have based on the mechanism.  And, again, working in conjunction with a physician, looking for injuries, first and foremost.  At that point in time, after all the diagnostics are done, if they want lab tests, x-rays, then they are given the opportunity, if they so desire, to have forensic documentation done of their injuries as well.  That is secondary though.
> Q. [Deputy Prosecutor:] Now can you explain the basis [sic] steps in your examination?
> A. [Forensic Nurse:] No matter what type of patient it is, any type of an assault patient or victim of violence we always do the same thing so I don't miss anything.  After getting their medical history, medications, speaking with them, asking where their discomfort is, how it happened, I would go from head to toe, and then from outer extremities then into the core of their body.  But, again, it would only be done after we know their vital signs are okay, their respiration are [sic] okay, and whatnot.
>                              *   *   *
> Q. [Deputy Prosecutor:] And is it important to determine who caused the injury for you[r] assessment?
> A. [Forensic Nurse:] Yes.
> Q. [Deputy Prosecutor:] And why is that?
> A. [Forensic Nurse:] Especially, again, victims of any type of violence, it would be really important to know if they knew who the perpetrator was.  Because a large part of the forensic nurse[']s job is to collaborate with social work and the patient *in*

2

*order to ensure safety plan* for that person if they are well enough to be discharged.

\* \* \*

Q. [Deputy Prosecutor:] And what difference does it make in knowing the identity of the person who caused the injuries?

A. [Forensic Nurse:] Your resources and *safety plan* would be a lot different, for instance, if you are attacked by a stranger, an unknown person in a parking garage, let's say, downtown, versus somebody who might be a family member or someone you are living with. If there is a common child, if you share a child, because there might be visitation, custody issues. So it's critically important that you know if you can find out who that person is.

Q. [Deputy Prosecutor:] And you consider that part of your role, not just the social workers?

A. [Forensic Nurse:] Uh, *safety plans for a patient of violence are a critical part of my role.* Again, it's first a medical evaluation to make sure the patient is stabilized, to make sure no injuries are missed. And then safety plan resources discharge where they're going to go, do they have a safe place. Those are all critically important also for the forensic nurse.

Tr. at 232-33, 234-35 (emphasis added).

Concerning the safety plan the following exchange occurred:

Q. [Deputy Prosecutor:] And what discharge plan was developed for [J.M.]?

A. [Forensic Nurse:] Mainly we just. . . We needed to make sure that she had a safe place to go. And I don't know how much I'm able to talk about this based upon. . .

Q. [Deputy Prosecutor:] Well, did you. . . So that was a concern to you?

A. [Forensic Nurse:] Oh, yeah.

Q. [Deputy Prosecutor:] Okay. And did you develop a discharge plan that attempted to ensure safety?

A. [Forensic Nurse:] Yes.

Q. [Deputy Prosecutor:] Also when she was in the hospital was she put on a certain, a specific status, based upon the history you'd been given?

A. [Forensic Nurse:] Yes. For. . .

Q. [Deputy Prosecutor:] What was that?

A. [Forensic Nurse:] . . .patients in her situation. And we also obtain permission from the patient before this is done. But patients like

3

> [J.M.] are made a no information patient in case someone who might have been the person who injured my patient would call the hospital looking for them, then we would have permission to say they were not there.
>
> Q. [Deputy Prosecutor:] Okay. So she was put on that status of a no. . .
>
> A. [Forensic Nurse:] No information patient.

Tr. at 290-91 (ellipses in original).

As the foregoing colloquy makes clear the Forensic Nurse was unequivocal in her contention that she needed to know the identity of J.M.'s abuser in order to develop a plan to protect J.M.'s safety. In essence the Forensic Nurse declared that she needed the information to provide J.M. appropriate treatment. The problem however is that other than placing J.M. on a "no information" status for the few hours she remained at the hospital that evening, nothing in the record of the trial of this cause establishes that the Forensic Nurse actually developed a so-called "safety plan."[1] Instead, upon release J.M. was instructed: "Take medications as prescribed," "Return for worsening symptoms," and "Follow up with primary care physician." State's Ex. 14, Ex. Confidential Vol. at 150. Indeed the "Depart Summary" reflects that J.M. was prescribed pain medication and experienced a "Routine Discharge" to "[h]ome." Id. at 171.

The question is whether objectively considered, the interrogation that took place in the course of the Forensic Nurse's interview with J.M. produced testimonial statements. Absent any evidence in the trial record that the abuser's identity was necessary to diagnose or treat J.M.'s injuries—either physical, emotional, or psychological—one is compelled to conclude that the primary purpose of the Forensic Nurse's interview with J.M. concerning the identity of her abuser was to "establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 822 (2006). Essentially, if the State insists on introducing "identity of the abuser" testimony through a medical care provider then it is absolutely imperative that the

---

[1] At a pretrial hearing the Forensic Nurse testified that as a part of a discharge plan J.M. was referred "to Julian Center and Legacy House." Tr. at 57. However no further details were provided. And J.M.'s medical records introduced at trial reveal, "p[atien]t parents state they are taking her home with them . . . Social work has cleared p[atient]t to go home." State's Ex. 14, Confidential Vol. at 181. This appears to me less a safety plan than a statement of fact.

4

State produce evidence at trial explaining how and why such testimony is relevant to medical treatment. That simply did not happen here.

In sum J.M.'s statements to the Forensic Nurse were testimonial and thus inadmissible in the face of a Sixth Amendment Confrontation Clause challenge. In the paraphrased words of the <u>Davis</u> Court, I "do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking [Forensic Nurse] *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition." <u>Davis</u>, 547 U.S. at 826. I therefore respectfully dissent from the majority's contrary position on this point. Otherwise I concur.

Dickson, J., concurs.