## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 23 2017, 8:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen Celestino-Horseman
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Brandon Lonnell Spinks,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

June 23, 2017

Court of Appeals Case No.
49A02-1606-CR-1269

Appeal from the Marion Superior Court

The Honorable Marc Rothenberg, Judge

Trial Court Cause No.
49G02-1512-F3-45587

**Altice, Judge.**

## Case Summary

[1] Brandon Spinks appeals his conviction for criminal confinement as a Level 3 felony. He contends that the trial court abused its discretion by admitting evidence of (1) the victim's identification of her attacker to emergency medical providers and (2) a recorded jail call between Spinks and his six-year-old son.

[2] We affirm.

## Facts & Procedural History

[3] On the afternoon of December 20, 2015, Doris Elliott became worried about her daughter E.C. upon talking with a friend and being unable to reach E.C. by phone. Elliott lived in Hammond, and E.C. lived in Indianapolis with her three young children.[1] After IMPD denied her request to check on her daughter's welfare, Elliott contacted her daughter Erica Battle, who also lived in Indianapolis. She encouraged Battle to check on her sister.

[4] That evening, Battle and a cousin went to E.C.'s house and knocked on doors and windows and yelled for E.C. They received no response. Battle also called E.C.'s cellphone and landline a number of times. Eventually, after Battle had returned to her own home, Spinks answered the landline. He indicated that he and E.C. had "got[ten] into it" that morning and that she had left around 8:30 a.m. *Transcript* at 164. When Battle stated that she was going to come over to

---

[1] Spinks is the father of the two oldest children – a son born in 2009 and a daughter born in 2010.

see the kids, Spinks told her to hold on and then he hung up the phone. He did not answer Battle's return calls.

[5] Thereafter, Battle went back to E.C.'s home. No one answered the door, so she called the police for a welfare check. Around 10:25 p.m., officers knocked and walked the perimeter. They determined that they did not have cause to force entry but indicated that the family could do so if they felt strongly about it. Battle then called her mother again to decide what to do, and Elliott said to kick the door down. Battle recruited others to help in the effort.

[6] After several kicks to the front door, Spinks yelled from inside and told them to stop. Spinks argued with the group through the door and stated that E.C. was alright. Battle eventually saw E.C. through a window and believed she looked frightened. The group then moved to the back of the home and broke through the sliding glass door. E.C. ran out with the children, as Battle and others struggled with Spinks until he fled the scene. E.C. "just kept crying and kept crying" and said she thought she was going to die. *Id*. at 175. She had injuries all over her body, including more than a dozen lacerations from being whipped with a cord, a blunt-force injury to her head, multiple bruises, and hair pulled out from the scalp.

[7] Police returned to the home shortly after 11:30 p.m., and E.C. was transported to the hospital. While being treated for her multiple injuries, E.C. informed her nurse that the father of her children had assaulted her over a period of several hours that day. Similarly, E.C. told her treating physician that her child's father

caused her injuries. E.C. indicated that she was pressing charges and assured her medical providers that she had a safe place to stay. E.C.'s nurse provided her with information on domestic violence upon her release, and E.C. left the hospital with a female friend or relative.

[8] On December 23, 2015, the State charged Spinks with a number of counts related to the assault, several of which were later dismissed. Following a jury trial, Spinks was convicted of Level 3 felony criminal confinement.[2] On May 18, 2016, the trial court sentenced Spinks to thirteen years, with ten years executed in the Department of Correction, one year in community corrections, and two years suspended to probation. On appeal, Spinks challenges the admission of certain evidence at trial. Additional information will be provided below as needed.

## Standard of Review

[9] A trial court's decision regarding the admission of evidence is squarely within that court's discretion, and we afford it great deference on appeal. *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013). We will not reverse such a decision unless it is clearly contrary to the logic and effect of the facts and circumstances of the case or misinterprets the law. *Id*.

---

[2] The jury found him guilty of two additional counts for which the trial court did not enter convictions due to double jeopardy concerns.

<h2 style="text-align:center">Discussion & Decision</h2>

<h3 style="text-align:center">1. Statement to Medical Providers</h3>

Spinks challenges evidence that was admitted pursuant to the hearsay exception for statements made for the purpose of medical diagnosis or treatment – Indiana Evidence Rule 803(4). Specifically, the nurse and doctor who treated E.C. testified, over Spinks's objection, to statements made by E.C. regarding the identity of her attacker. Spinks argues that "the identity of the alleged assailant was not necessary for medical treatment or diagnosis." *Appellant's Brief* at 11.

Evid. R. 803(4) permits statements made for the purpose of medical diagnosis or treatment to be admitted into evidence, even when the declarant is available. The rule requires that the statement:

> (A) is made by a person seeking medical diagnosis or treatment;
>
> (B) is made for--and is reasonably pertinent to--medical diagnosis or treatment; and
>
> (C) describes medical history; past or present symptoms, pain or sensations; their inception; or their general cause.

*Id*. The exception is grounded in a belief that the declarant's self-interest in obtaining proper medical treatment makes such a statement reliable enough for admission at trial. *VanPatten*, 986 N.E.2d at 260.

> This belief of reliability, though, necessitates a two-step analysis for admission under Rule 803(4): First, "is the declarant motivated to provide truthful information in order to promote diagnosis and treatment," and second, "is the content of the

statement such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment."

*Id.* (quoting *McClain v. State,* 675 N.E.2d 329, 331 (Ind. 1996)).

[12] Although statements attributing fault or establishing a perpetrator's identity are usually inadmissible under the medical diagnosis and treatment exception, this is not true for cases involving child abuse, sexual assault, or domestic violence. *Ward v. State*, 50 N.E.3d 752, 759 (Ind. 2016); *Perry v. State*, 956 N.E.2d 41, 49 (Ind. Ct. App. 2011). Given the unique nature of domestic violence cases, our Supreme Court has recognized that "identifying attackers is integral to the standard of care for 'medical treatment' of domestic abuse victims." *Ward*, 50 N.E.3d at 761. Indeed, "patient safety is a 'critical' part of the comprehensive standard of care for treating victims of domestic violence." *Id.* at 763.

> The standard of care for "medical treatment" of domestic abuse goes beyond physical injuries, and even beyond immediate outcomes like who takes a victim home or what medications a patient receives. Rather, it requires nurses and physicians to rely on information obtained from patients to triage their injuries – both mental and physical – and implement comprehensive treatment plans. Doctors and nurses *need* to know the identity of the perpetrator when treating a victim of domestic violence.

*Id.* (emphasis in original).

[13] Nothing in the particular circumstances of this case leads us away from our Supreme Court's conclusion in *Ward* that identifying a domestic violence

victim's attacker is integral to the medical standard of care for such cases.[3] Here, the nurse testified that knowing the identity of the attacker "is helpful in providing resources for the patient" and ensuring their safety in the hospital by alerting security and making the patient's chart private. *Transcript* at 259. Similarly, E.C.'s doctor testified that treating the patient as a whole (that is, beyond their physical injuries) includes addressing the patient's safety and emotional needs. Cole's statements to her nurse and doctor in the emergency room regarding the identity of her attacker were properly admitted under Evid. R. 803(4).

### 2. Recorded Jail Call

[14] Spinks also challenges the admission of a redacted recording of a jail call between himself and his six-year-old son, B.S.J.[4] The child's speech on the recording is muddled and difficult to understand. Spinks, however, understood B.S.J.'s statements to him as follows: "Don't kill my Momma" and "I'm gonna beat you up." *Exhibits*, State's Exhibit 52-R. When B.S.J. then inquired as to where Spinks was, Spinks indicated that he was in jail and that "Daddy messed up" and "Daddy made a uh-oh." *Id*. Spinks claims that B.S.J.'s statements

---

[3] Contrary to Spinks's assertion on appeal, the holding in *Ward* is not limited to statements obtained by forensic nurses.

[4] Spinks initiated the call from the Marion County Jail by calling a third party who in turn called E.C. In this three-way call, Spinks spoke with E.C. and B.S.J. The recording admitted into evidence was substantially redacted.

should have been redacted from the recording because they were more prejudicial than probative.

[15] Indiana Evidence Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." "Evaluation of whether the probative value of an evidentiary matter is substantially outweighed by the danger of unfair prejudice is a discretionary task best performed by the trial court." *Bryant v. State*, 984 N.E.2d 240, 249 (Ind. Ct. App. 2013), *trans. denied*.

[16] Here, B.S.J.'s declarations during the jail call with Spinks provided context for Spinks's subsequent (unchallenged) statement to the child that he was in jail because he had messed up. In other words, the child's prompts made it more probable that Spinks was referring to the charged offenses when he made his admission. While the probative value of this evidence may be low, so too was its prejudicial effect. Thus, we cannot say that the trial court abused its discretion in this regard.

[17] Judgment affirmed.

Baker, J. and Pyle, J., concur.