## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 20 2020, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Supervising Deputy
Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mitchell Tickle, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | February 20, 2020 <br><br> Court of Appeals Case No. 19A-CR-1900 <br><br> Appeal from the Decatur Circuit Court <br><br> The Honorable Timothy B. Day, Judge <br><br> Trial Court Cause No. 16C01-1902-F1-196 |

**Baker, Judge.**

[1] Mitchell Tickle, Jr., appeals his conviction and the sentence imposed by the trial court for Level 1 Felony Child Molesting,[1] arguing that (1) the trial court erred by admitting certain evidence; (2) the State committed prosecutorial misconduct; (3) the evidence was insufficient to support the conviction; and (4) the sentence was inappropriate in light of the nature of the offense and his character. Finding no error, no misconduct, that the evidence was sufficient, and that the sentence was not inappropriate, we affirm.

## Facts

[2] On February 11, 2019, South Decatur Elementary School called in Decatur County Sheriff's Deputy Schanel Manek and a representative from the Indiana Department of Child Services to investigate a report of potential child molesting after five-year-old P.T., Tickle's daughter, made a disturbing disclosure. After speaking with P.T. at the school, Deputy Manek transported P.T. to the local Child Advocacy Center (CAC) for a forensic interview.

[3] Over the course of one and one-half hours, the CAC interviewer and P.T. discussed many different things. P.T. understood what her private parts were and labeled them as her "front business" and her "back business." State's Ex. 1(A) at 26:20-26:22.[2] After first denying that anyone had touched her in or on her private parts, P.T. told the CAC interviewer that "something happened"

---

[1] Ind. Code § 35-42-4-3(a)(1).

[2] All time stamps come from the CD recording of the CAC interview that was shown to the jury at trial.

involving ghosts and scary stories. *Id.* at 39:00-41:27. P.T. stated that one day, she and Tickle were at their house and had a discussion in the bathroom. P.T. was at first reticent to discuss the contents of the conversation because she was worried that "Daddy is gonna go to jail." *Id.* at 42:40-42:42. But then P.T. admitted that something had happened to her "more than one time." *Id.* at 45:39. P.T. also stated that she had previously told her grandmother about what took place and that Tickle had gotten upset with P.T. about disclosing that information and threatened her.

[4] According to P.T., the things that occurred between her and Tickle happened "in her business" and "at Daddy's house." *Id.* at 48:45-49:03. P.T. said that every time it happened, "all of her clothes were off," *id.* at 50:55, and that "all of [Tickle's] clothes were off," *id.* at 51:10. Everything took place "in [Tickle's] bedroom, always." *Id.* at 51:25. P.T. said that the first time, "his balls were in [her] business." *Id.* at 53:25-53:35. Tickle would "cover[] [P.T.] up so no one looks." *Id.* at 55:29-55:31. Later, P.T. confessed that Tickle's "front business" was touching her "front business." *Id.* at 56:50-57:00. After a while, Tickle "gets [his private parts] out when he wants to . . . when [she] feels it coming out." *Id.* at 57:40-57:53. P.T. stated that when Tickle finishes, he "puts it back in his shorts." *Id.* at 58:44-58:55. P.T. admitted that Tickle oftentimes "put it almost all the way in" and that it "makes [her] cry." *Id.* at 59:13-59:18. To P.T., Tickle's private parts felt "wet." *Id.* at 1:00:05. The CAC interviewer then asked P.T. to describe what Tickle's private parts looked like, so P.T. drew a picture of them. P.T. stated that these things happened to other little girls she knew.

[5]     After a few breaks, the interview continued. The CAC interviewer showed P.T. a diagram of the female and male anatomies and asked P.T. to point out all the private parts where a person should not be touched. P.T. repeatedly described the "front business" and "back business" and how Tickle would touch her when he was wet. *Id.* at 1:15:30-1:18:30. P.T. also mentioned that "Daddy wanted me to put his ball on my mouth, and I didn't like it. . . . Because he peed in it." *Id.* at 1:19:20-1:19:38. P.T. described the urine as tasting like "orange stuff," *id.* at 1:20:57, and that it looked yellow, *id.* at 01:21:11. The CAC interviewer asked a few miscellaneous follow-up questions before she concluded the interview.

[6]     Shortly thereafter, the CAC sent P.T. to a local hospital for a sexual assault examination while officers arrested Tickle. The examination results did not reveal that P.T. had been raped. On February 14, 2019, the State charged Tickle with one count of Level 1 felony child molesting. The State filed a notice of intent to introduce the CAC interview as evidence under the protected person's statute so that P.T. would not have to testify openly at trial. The trial court conducted a June 17, 2019, pre-trial hearing on this matter, at which Dr. Edward Connor, a licensed psychologist testifying on behalf of the State, concluded that P.T. would suffer emotional damage should she be forced to testify at trial. P.T.'s therapist, social worker Alisha Scoville, also testified as to P.T.'s emotional state and concluded that "[c]linically my opinion is [P.T. testifying] would be very emotionally distressing for P.T., due to the nature of the abuse in question and her relationship." Tr. Vol. II p. 31.

Finally, Deputy Manek testified as to P.T.'s temperament and comportment. He mentioned that he has observed P.T.'s behavior multiple times when he transported her to various court proceedings and observed that:

> [s]he on multiple occasions has felt sick to her stomach, to the point where we have given her a trash can, offered the trash can. She doesn't want to eat or drink. Very anxious, when trying to figure out what's going to happened [sic] next. Tends to like the females around here, but the males that approach her, she looks down, and does not want to look at them. And, it takes a longs [sic] time to even try to warm up to anybody, but the female she tends to be a little bit more at eased [sic] with.

*Id.* at 48-49.

Ultimately, the trial court concluded that P.T. would suffer severe emotional damage should she have to testify at trial and held as follows:

> So, I think the State has met its burden. And, I've heard from two different witnesses, that she's capable of understanding the difference between the truth, and a lie. I'm going to ask her some questions here in a second, to make sure that she is able to understand an oath.
>
> But, I think the State's met its burden under Indiana Code 35-37-4-6 to allow video to be played at trial, without requiring the child to be present, and cross examined in the courtroom in front of [Tickle], and the jury. Which gives rise to the ability on the Defense's part to cross examine [P.T.], and we started talking about it at the beginning of the hearing how we were going to do that, if I was to reach the finding that I'm making. In the courtroom is a monitor.
>
> And, my understanding is, [P.T.] is in a different room. In the courtroom is, [Tickle], and his defense counsel, and the prosecutor, as well as myself, and the court reporter. There is a

camera in the courtroom fixed upon the video monitor for purposes of recording the questioning of [P.T.]

*** 

Okay. So, we will be able to depict, make a record that [Tickle] is present during the cross examination, his attorney is here. Both will be able to see, and hear [P.T.] And, that should be shown on the video camera that is being made. So, [P.T.] is testifying by a close circuit television.

*Id.* at 62-63. In other words, P.T.'s testimony would come from the recorded CAC interview, but Tickle's counsel would still be able to cross-examine P.T. from a separate room.

[9] Tickle's jury trial commenced on June 25, 2019. During trial, the State moved to admit the recorded CAC interview with P.T. into evidence as Exhibit 1(A). In response to the offer of evidence, Tickle stated, "I don't object, Your Honor." *Id.* at 167. The jury was then allowed to watch and listen to the CAC interview as well as the recording of Tickle's counsel's cross-examination of P.T. At the conclusion of trial on June 27, 2019, the jury found Tickle guilty as charged. At Tickle's July 23, 2019, sentencing hearing, the trial court sentenced him to a forty-year term, with five years suspended to probation. The trial court found P.T.'s young age, the fact that Tickle took advantage of his parental relationship with P.T., and Tickle's prior criminal history to be aggravators. Tickle now appeals.

# Discussion and Decision

# I. Admission of Evidence

First, Tickle argues that the trial court erred when it admitted the CAC interview. "The admission and exclusion of evidence falls within the sound discretion of the trial court[.]" *Reed v. Bethel*, 2 N.E.3d 98, 107 (Ind. Ct. App. 2014). Reversal of a trial court's decision to admit evidence is appropriate only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997). "Moreover, we will sustain the trial court if it can be done on any legal ground apparent in the record." *Jester v. State*, 724 N.E.2d 235, 240 (Ind. 2000).

However, Tickle did not object to the introduction of the CAC interview. It is well established that "[a] contemporaneous objection at the time the evidence is introduced at trial is required to preserve the issue for appeal[.]" *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). "A claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred." *Id.* "The fundamental error exception is 'extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process.'" *Id.* (quoting *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006)).

[12]  Specifically, Tickle contends that the State failed to demonstrate that P.T. would suffer extreme emotional distress should she be forced to testify in person; accordingly, the trial court erred when it ruled that P.T. was qualified under the protected person statute to have her statements given in a recorded interview in lieu of live testimony. Therefore, according to Tickle, not allowing him to confront and cross-examine P.T. in person violated his rights under the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution.

[13]  Pursuant to Indiana Code section 35-37-4-6(e)(2)(B)(i), the State can show that the protected person is found to be unavailable as a witness for the following reason: "[f]rom the testimony of a psychiatrist, physician, or psychologist, and other evidence, if any, the court finds that the protected person's testifying in the physical presence of the defendant will cause the protected person to suffer serious emotional distress such that the protected person cannot reasonably communicate." The State relied on this exception when it called psychologist Dr. Edward Connor, social worker Alisha Scoville, and Deputy Manek to prove that P.T. would suffer severe emotional distress should she be forced to testify in front of Tickle at trial.

[14]  We find that the trial court made no error in its assessment of P.T. as a protected person under the statute. The State presented three separate witnesses of varying backgrounds to describe their interactions with P.T. and how testifying at trial might affect her mental and emotional state. All three reached a similar conclusion—namely, that given the unmitigated trauma that P.T. has

experienced from her ordeal and given the high emotional stakes of the case, it would be best for P.T. to testify via a recorded interview. They ultimately determined that P.T. would suffer severe emotional harm should she be forced to testify against Tickle face-to-face, and we see no error in the trial court's reasoning. Any attempt by Tickle to have us reexamine P.T.'s distracted nature or the credibility of the State's witnesses is nothing more than a request that we reweigh the evidence, which we may not do.

[15] Now, with regards to whether the admission of the CAC interview violated Tickle's federal and state constitutional rights, we find little merit to Tickle's arguments. Under the Sixth Amendment's Confrontation Clause, the United States Supreme Court has explicitly stated, in pertinent part, as follows:

> In sum, we conclude that where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.

*Maryland v. Craig*, 497 U.S. 836, 857 (1990). In other words, the procedure utilized in Tickle's trial did not violate his federal constitutional rights because the right to confront and cross-examine witnesses is not absolute.

[16] Next, with regards to Article 1, Section 13 of the Indiana State Constitution, which states that "[i]n all criminal prosecutions, the accused shall have the right

. . . to meet witnesses face to face," our Supreme Court has held that "the federal right of confrontation and the state right to a face-to-face meeting are co-extensive." *Brady v. State*, 575 N.E.2d 981, 987 (Ind. 1991). Further, our Supreme Court has interpreted Article 1, Section 13 to mean the following:

> Nonetheless, neither the Sixth Amendment nor Article 1, Section 13 have been interpreted literally to guarantee a criminal defendant all rights of confrontation at every trial for every witness. Otherwise, no testimony of any absent witness would ever be admissible at trial. . . .
>
> ***
>
> However, where a defendant has never had the opportunity to cross-examine a witness and meet him face to face, admission of prior testimony at a subsequent proceeding violates the constitutional right of confrontation.

*State v. Owings*, 622 N.E.2d 948, 951 (Ind. 1993).

[17] And here, Tickle was given the opportunity to thoroughly cross-examine P.T., and that recording was shown to the jury at trial. So while the language of Indiana's corollary to the Sixth Amendment "has a special concreteness and is more detailed," *Ward v. State*, 50 N.E.3d 752, 756 (Ind. 2016), the trial court nevertheless followed the provision's strictures, provided Tickle with an opportunity to cross-examine P.T., and coordinated with both parties to ensure that Tickle's due process rights would not be violated.

[18] Indiana's choice to mirror the United States Supreme Court's holding and include such an exception to Article 1, Section 13 is evident by the establishment of the protected person statute. Our General Assembly has

codified the holding of *Craig* and provided an avenue for young children and others who might benefit from testifying separate and apart from a criminal defendant. Given this constitutional and statutory background, we find no error emanating from the trial court's decision. The admission of the CAC interview did not violate Tickle's rights under the federal or state constitutions.

[19] Also, as a matter of procedure, Tickle's claims fail on two fronts. First, Tickle did not object to the admission of the CAC interview as evidence. When asked directly about the State's introduction of the video, Tickle's counsel replied with "I don't object, Your Honor." Tr. Vol. II p. 167. And second, Tickle made an agreement with the State to have his counsel confront and cross-examine P.T. in a separate room, and that video was shown to the jury. It is apparent to us that the trial court took the necessary precautions to safeguard Tickle's constitutional rights. We are not persuaded by Tickle's claims when this entire process was coordinated between counsel on both sides. Stated another way, we are unwilling to find a constitutional violation on appeal when the matter was both settled and explicitly uncontested at trial.

[20] In sum, the trial court did not err when it admitted the CAC interview.

## II. Prosecutorial Misconduct

[21] Next, Tickle argues that the State committed prosecutorial misconduct. When a defendant has failed to object to alleged prosecutorial misconduct at the trial court level, he has effectively waived the issue, and we may then review the matter only for fundamental error. *Ryan v. State*, 9 N.E.3d 663, 667-68 (Ind.

2014). To prevail on a claim of fundamental error, the defendant must show that the alleged misconduct was so prejudicial to his rights that it made a fair trial impossible. *Id.* at 668.

[22] To show prosecutorial misconduct, the defendant must show that the alleged misconduct (1) constituted a clearly blatant violation of basic and elementary principles of due process; (2) presented an undeniable and substantial potential for harm; and (3) made a fair trial impossible. *Washington v. State*, 902 N.E.2d 280, 290 (Ind. Ct. App. 2009). Moreover, the alleged misconduct must have subjected the defendant to grave peril and had a probable persuasive effect on the jury's decision. *Id.*

[23] Specifically, Tickle contends that the State committed prosecutorial misconduct in two ways: (1) the State elicited improper testimony from the nurse who examined P.T. for her sexual assault examination; and (2) the State made a closing argument that prejudiced Tickle.

### *Testimony*

[24] Essentially, Tickle argues that the State intentionally presented an evidentiary harpoon when it had the nurse testify. "An evidentiary harpoon occurs when the prosecution places inadmissible evidence before the jury for the deliberate purpose of prejudicing the jurors against the defendant." *Evans v. State*, 643 N.E.2d 877, 879 (Ind. 1994). To prevail on this claim, Tickle must show both that the prosecutor acted deliberately to prejudice the jury and that the evidence was inadmissible.

The testimony in contention is the nurse's statements about the routine procedure for a sexual assault examination. The nurse also provided statistics from a gynecological journal concerning the number of adolescents who exhibited physical symptoms of sexual assault following an alleged rape. *See generally* Tr. Vol. II p. 220-23.

We find nothing in the nurse's testimony that would render it inadmissible, and Tickle does not point to any specific testimony from the nurse that violates the rules of evidence. Though it may not have been the State's best strategy to have a witness recite statistics from a medical journal, it was established that the nurse had conducted the actual sexual assault examination, had firsthand knowledge of the situation, and had interacted with P.T. in person. Therefore, the nurse's testimony was not inadmissible.

Moreover, Tickle does not point to any specific evidence showing that the prosecutor presented this evidence to deliberately prejudice the jury against Tickle. Upon further review, we likewise find none. In sum, Tickle has not demonstrated that the State committed prosecutorial misconduct in this instance.

### *Closing Argument*

Next, Tickle contends that the State prejudiced him when the prosecutor stated the following during closing argument:

> Another way of saying this, and the status of the law is, is that you may find a conviction, you may convict, of the crime of child molesting, based solely on the uncorroborated testimony of

the victim, if you find yourself convinced by it and you decide to assign the greatest value to it. It doesn't matter that there's only one, because the quantity of evidence or number of the witnesses need not control your determination of the truth. You can reach a conviction on a he said, she said if what one of them said, if you believe that the State's burden has been met.

Tr. Vol. III p. 93-94. Specifically, Tickle argues that "[b]ecause the trial court may not instruct the jury as the prosecutor did, the prosecutor committed misconduct during final argument." Appellant's Br. p. 35. However, Tickle's argument is unavailing.

[29] While it is the province of the trial court to define the proper evidentiary scope and the law of the case, we can hardly say that the prosecutor's statements here placed Tickle in grave peril. Following the State's closing argument, the trial court reminded the jury in the final written jury instructions of its duties and how it should weigh the evidence during deliberation. *See* Appellant's App. Vol II p. 123-25. Thus, any potential bias or harm inflicted by the prosecutor was alleviated by the trial court's final word.

[30] Moreover, the prosecutor did not state anything incorrectly or imperil Tickle's right to a fair trial. "[A] conviction for child molesting may rest solely upon the uncorroborated testimony of the victim." *Link v. State*, 648 N.E.2d 709, 713 (Ind. Ct. App. 1995). As such, the prosecutor's comment about the jury being able to rely on only P.T.'s uncorroborated testimony from the video recording is both an accurate and succinct recitation of pertinent Indiana law. Though Tickle is correct in stating that "[t]he Indiana Supreme Court has disapproved

of a jury instruction directing the jury that it may find guilt based on the uncorroborated testimony of a single person," appellant's br. p. 39, the prosecutor's statement was not a final jury instruction.

[31] In sum, we find that Tickle has failed to present any probative evidence proving that the State committed prosecutorial conduct.

## III. Sufficiency of Evidence

[32] Next, Tickle argues that the evidence was insufficient to support his conviction for Level 1 felony child molesting. When reviewing the sufficiency of the evidence supporting a conviction, we must affirm if the probative evidence and reasonable inferences drawn therefrom could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). It is not our job to reweigh the evidence or to judge the credibility of the witnesses, and we consider any conflicting evidence most favorably to the trial court's ruling. *Wright v. State*, 828 N.E.2d 904, 906 (Ind. 2005).

[33] To convict Tickle of Level 1 felony child molesting, the State was required to prove beyond a reasonable doubt that Tickle, who was at least twenty-one years old at the time of the offense, knowingly or intentionally performed or submitted to sexual intercourse or other sexual conduct with P.T., who was under the age of fourteen. I.C. § 35-42-4-3(a)(1).

[34] Tickle chiefly contends that the evidence is too weak to support his conviction because the jury primarily relied upon the uncorroborated statements of a five-

year-old girl.[3] As we have already stated, it is well established that "the uncorroborated testimony of a child victim is sufficient to support a conviction of child molesting." *Wisneskey v. State*, 736 N.E.2d 763, 764 (Ind. Ct. App. 2000). And for nearly one and one-half hours, P.T. recounted her harrowing experiences with Tickle.

[35] Though hesitant at first and without the proper biological vocabulary, P.T.—a minor who was five years old at the time—nevertheless revealed that Tickle forced her into unwanted and thoroughly disturbing experiences. P.T. showed a clear understanding of where a man's and woman's private parts were and repeatedly talked about how Tickle put his "front business" into her "front business." State's Ex. 1(A) at 56:50-57:00. She even went so far as to evoke the pain she experienced when Tickle allegedly "put it almost all the way in." *Id.* at 59:13-59:18. In more graphic detail, P.T. testified that Tickle had urinated in her mouth and stated that it had tasted like orange and looked yellow in appearance. *Id.* at 1:20:57-1:21:11. A fact-finder could reasonably conclude that these actions amounted to either sexual intercourse or sexual conduct.

[36] Tickle contests this conclusion and points out that "P.T.'s frequently vague responses to the CAC examiner were inherently and explicitly contradictory."

---

[3] Tickle seemingly ignores the fact that in most sexual assault cases—especially those involving minor children—there are usually no other witnesses or physical evidence, primarily due to the clandestine nature of the crime. So, while there was no physical indication from the sexual assault examination that P.T. had been raped, this does not preclude a jury from rendering a guilty verdict based upon P.T.'s uncorroborated testimony alone.

Appellant's Br. p. 28. However, Tickle's attempts to have us reevaluate the very credibility of P.T.'s recorded testimony is nothing more than a request that we reweigh the evidence, which we may not do. It is the province of the jury, not of this Court on appeal, to determine whether P.T.'s statements were credible.[4] And here, there was sufficient evidence upon which the jury could rely in rendering the verdict that it did. In other words, there was sufficient evidence such that a reasonable trier of fact could have convicted Tickle of Level 1 felony child molesting.

# IV. Appropriateness

[37] Finally, Tickle argues that the sentence imposed by the trial court is inappropriate in light of the nature of the offense and his character.

[38] Indiana Appellate Rule 7(B) states that a "Court may revise a sentence . . . if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The question is not whether another sentence is more appropriate, but whether the defendant's specific sentence is inappropriate.

---

[4] As an aside, we find that Tickle's reliance on the incredible dubiosity rule is misplaced. The "incredible dubiosity" rule "is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredibly dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002) (internal citation omitted). We find nothing in P.T.'s testimony to be inherently dubious or improbable, and we decline to apply such a standard of review when there is no indication that P.T.'s testimony was anything but her own. Furthermore, we are most aware that all five-year-old children are "easily distracted," appellant's br. p. 25, and that being frequently inattentive or wanting to draw and talk about other things does not necessarily undercut a child's credibility in court.

*Steinberg v. State*, 941 N.E.2d 515, 535 (Ind. Ct. App. 2011). In determining whether the sentence is inappropriate, we will consider numerous factors such as culpability of the defendant, the severity of the crime, the damage done to others, and a "myriad [of] other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). The defendant bears the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[39] For someone who commits the offense of Level 1 felony child molesting, the maximum sentence is fifty years, and the minimum sentence is twenty years. Ind. Code § 35-50-2-4(c). The advisory sentence is thirty years. *Id.* Here, the trial court imposed a forty-year term, with five years suspended to probation.

[40] First, as to the nature of the offense, Tickle has committed a truly horrific offense—the sexual molestation of a minor child. Not only that, but Tickle performed these actions on his own daughter. The trial court noted the grotesque nature of Tickle's actions when it found Tickle's betrayal of P.T.'s trust to be an aggravating factor during sentencing. And according to P.T.'s testimony, Tickle assaulted P.T. multiple times and committed these same actions with other little girls. To exacerbate the repulsive nature of what he did, Tickle even urinated in P.T.'s mouth and raped her up until the point where she admitted that it physically hurt her. Without a doubt, Tickle has inflicted long-term psychological trauma on a young girl, and she will have no choice but to live with these scarring experiences for the rest of her life. Therefore, we find that the nature of the offense does not render Tickle's sentence inappropriate.

[41] Then, as to Tickle's character, Tickle has a long criminal history. He has previously been convicted of reckless driving, burglary, theft, and resisting law enforcement. *See Bailey v. State*, 763 N.E.2d 998, 1004 (Ind. 2002) (holding that a history of criminal activity can reflect poorly on a defendant's character at sentencing); *see also Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007) (holding that "it is appropriate to consider such a [criminal] record as a poor reflection on the defendant's character, because it may reveal that he . . . has not been deterred even after having been subjected to the police authority of the State[]"). And, according to P.T.'s testimony, after P.T. informed her grandmother about what Tickle had done to her, Tickle became very upset and threatened P.T. Furthermore, Tickle has exhibited no remorse for the damage he has caused, and thus, we find that Tickle's character does not render his sentence inappropriate. In sum, we will not revise Tickle's sentence pursuant to Indiana Appellate Rule 7(B).

[42] The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.