## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before any
court except for the purpose of establishing
the defense of res judicata, collateral
estoppel, or the law of the case.



FILED

Jun 05 2020, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ronald K. Smith
Muncie, Indiana

ATTORNEY FOR APPELLEE

Myriam Serrano
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Damarco L. Churn,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 5, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2799<br><br>Appeal from the Delaware Circuit<br>Court<br><br>The Honorable Marianne L.<br>Vorhees, Judge<br><br>Trial Court Cause No.<br>18C01-1905-F5-81 |

**Mathias, Judge.**

[1] Damarco Churn ("Churn") was convicted in Delaware Circuit Court of Level 5 felony domestic battery resulting in bodily injury to a pregnant woman and Level 5 felony strangulation. Churn appeals his convictions and raises two issues, which we restate as:

I. Whether his Sixth Amendment right to confrontation was violated when medical providers were permitted to testify that the victim identified Churn as her assailant; and,

II. Whether the trial court abused its discretion when it denied his motions for mistrial.

We affirm.

## Facts and Procedural History

On April 29, 2019, Churn brutally beat and strangled his pregnant girlfriend, M.N.C. Churn and M.N.C. were involved in an argument that began on April 28, 2019, via text message. During the argument, Churn threatened to beat M.N.C. until she and the baby were dead. Tr. p. 55. M.N.C. locked the doors to her residence and told other residents to deny entry to Churn. When Churn arrived at the residence on April 29, 2019, he yelled and kicked at the doors. Another resident unlocked a door and allowed him to enter the home.

M.N.C. dialed 911 and tried to hide in her bedroom. Churn found M.N.C. in her bedroom and took her phone from her. When law enforcement arrived to investigate the hang up 911 call, the other resident told the officer it was a mistake and no one meant to call 911.

Churn proceeded to beat M.N.C. on her chest, head and arms while she attempted to protect her abdomen. Churn sprayed M.N.C. with pepper spray and ripped her shirt off. M.N.C. was able to grab a new shirt and ran out of the house. But she returned to the house to get her shoes and cell phone. Churn

refused to return her cellphone to her. M.N.C. complained of burning from the pepper spray, and Churn told her to take a shower, which she did. While she was in the shower, Churn hit M.N.C., and she fell to the bottom of the bathtub. Churn then stomped on her with his foot, striking her head and back. M.N.C. eventually fled the house through the bathroom window.

[6] M.N.C. went to the emergency room later that day. Law enforcement officers who investigated the assault observed that M.N.C.'s face was bruised, a fake eyelash was missing, she had abrasions on her arms, legs, and back, and redness around her neck. M.N.C. had difficulty swallowing. At the emergency room, M.N.C. was examined by Physician Ryan Wallace and Forensic Nurse Examiner Christi Wohlt.

[7] On May 1, 2019, Churn was charged with Level 5 felony domestic battery resulting in bodily injury to a pregnant woman, Level 5 felony strangulation, Level 6 felony domestic battery, and Class A misdemeanor interference with reporting a crime. Prior to trial, the trial court granted the State's motion to dismiss the Level 6 felony battery and Class A misdemeanor charges.

[8] At the jury trial held on October 7 and 8, 2019, M.N.C. testified that she and Churn were still involved in a romantic relationship. She stated she remembered going to the emergency room on April 29, 2019, but could not remember the assault. Tr. p. 139. Therefore, evidence concerning the assault and M.N.C.'s resulting injuries was introduced through the testimony of law enforcement officers, the examining nurse and physician, and M.N.C.'s

grandmother. Churn objected to the nurse's and doctor's testimony on the grounds that allowing them to testify to M.N.C.'s statement that Churn assaulted her violated his right of confrontation under the Sixth Amendment.

[9] Christi Wohlt gave extensive testimony concerning M.N.C.'s description of the assault and her resulting injuries. Wohlt, a registered nurse and forensic nurse examiner at Ball Memorial Hospital, examined M.N.C. when she arrived in the emergency room on April 29, 2019, at approximately 7:30 p.m. During the examination, M.N.C. was tearful and upset. Wohlt noted that M.N.C. was approximately three months pregnant. During the examination, Wohlt observed marks on M.N.C.'s throat and asked her if she had been strangled. M.N.C. said Churn strangled her twice. As required by her training, Wohlt completed a "body map" documenting M.N.C.'s physical injuries. Tr. pp. 61–62. Wohlt also took ninety-two photographs of M.N.C.'s injuries, which were admitted at trial. Ex. Vol. 1, State's Ex. 16-111. Both Wohlt and Dr. Wallace testified that M.N.C. stated that her boyfriend assaulted her. Tr. pp. 54, 114.

[10] Churn also requested a mistrial on two occasions during trial. In the first instance, the State elicited testimony from Muncie Police Department Officer Ryan Plummer concerning a 911 hang up call. Officer Plummer testified that he responded to a 911 hang up call and spoke to a female, not M.N.C., who answered the door at the address the call originated from. The State then asked, "[d]o you have personal knowledge if Damarco Churn ever lived at this address?" Tr. p. 34. Officer Plummer responded, "[w]e had calls previous there involving him, yes." *Id.* Churn requested a mistrial because the State placed

evidence before the jury that Churn "may have had" contacts "with the law in the past." *Id*. at 35. Churn also argued that an admonition to the jury to disregard Plummer's testimony would not be sufficient. The trial court denied the motion for mistrial and gave the following admonishment to the jury:

> I'm advising you, and admonishing you as the jury, that this witness does not have any personal knowledge about where Damarco Churn was living. So I'm asking you to disregard that. Any information he has is hearsay. I'm also admonishing you and directing you to disregard any testimony that may have been given about police calls to this address, or concerning the Defendant.

Tr. pp. 37–38.

[11] The State also presented the testimony of Darla Carter, M.N.C.'s grandmother. Carter was asked if M.N.C. and Churn were "still in a relationship." Tr. p. 124. Carter replied, "[h]e's currently incarcerated." *Id*. Churn immediately moved for a mistrial. The State argued that because it was planning to admit evidence of a jailhouse phone call between Churn and M.N.C. from the night before, the jury would be presented with additional evidence that Churn was incarcerated, rendering Carter's response harmless. The trial court concluded that an admonishment would cure the error and stated to the jury:

> I'm advising and admonishing the jury to disregard the witness's comment about incarceration. Whether the Defendant is or is not incarcerated[] does not have any impact on whether the Defendant is guilty or not guilty in this case. You are not to consider [] whether the Defendant is or is not incarcerated. You don't have any information or you won't get any information

about why he's incarcerated, how long he's been incarcerated, if he is incarcerated, that type of thing. So you will have to disregard.

Tr. pp. 128–29.

[12] Carter further testified that she went to the emergency room when she learned that M.N.C. was there on April 29, 2019. Carter also described M.N.C.'s injuries to the jury.

[13] M.N.C. testified that she and Churn had a "video visit on a jail phone call" after the first day of trial. Tr. p. 144. The call was made on Churn's cellmate's account. Tr. pp. 146, 163. Churn told M.N.C. to testify that he did not assault her on April 29, 2019. Tr. p. 145. M.N.C. testified that she did not remember seeing Churn on April 29, 2019. Tr. p. 150. The trial court also admitted M.N.C.'s statement to the police identifying Churn as her assailant over Churn's objection. Tr. pp. 148–49; Ex. Vol. 1, State's Ex. 113.

[14] The jury found Churn guilty of Level 5 felony domestic battery and Level 5 felony strangulation. A sentencing hearing was held on November 25, 2019. The trial court noted twenty-year-old Churn's four prior felony convictions and that he was on supervised probation when he committed the offenses in this case. The court also noted that he attempted to manipulate M.N.C.'s testimony and minimized her injuries, demonstrating a lack of remorse. The trial court ordered Churn to serve concurrent terms of five years executed in the Department of Correction for both convictions. Churn now appeals.

## I. Right of Confrontation

Churn argues that allowing Wohlt and Dr. Wallace to testify that M.N.C. told them that Churn attacked her violated his right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 13 of the Indiana Constitution. A trial court generally has broad discretion in ruling on the admissibility of evidence, and we disturb a trial court's evidentiary rulings only upon an abuse of discretion. *Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013). However, when a defendant contends that a constitutional violation has resulted from the admission of evidence, the standard of review is de novo. *Id.*

The Sixth Amendment's Confrontation Clause provides, in relevant part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), "the [U.S.] Supreme Court held that the Confrontation Clause . . . prohibits admission in a criminal trial of testimonial statements by a person who is absent from trial, unless the person is unavailable and the defendant had a prior opportunity to cross-examine the person." *Fowler v. State*, 829 N.E.2d 459, 464 (Ind. 2005), *abrogated in part on other grounds by Giles v. California*, 554 U.S. 353 (2008).

However, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [the declarant's] prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford*, 541 U.S. at 59 n.9. And our Supreme Court has clarified that claimed

losses of memory at trial have no effect on availability for purposes of the Confrontation Clause:

> Although some courts and commentators contended that a witness who asserts an inability to recall any significant information is for all practical purposes unavailable for confrontation, this issue was settled in *United States v. Owens*, 484 U.S. 554, 558, 108 S. Ct. 838, 98 L.E.2d 951 (1988). In *Owens*, the Supreme Court . . . held that as long as the declarant testifies the Confrontation Clause has been satisfied even if the declarant is unable to recall the events in question. *Id*. at 558, 108 S. Ct. 838. . . . The feigned or real absence of memory is itself a factor for the trier of fact to establish, but does not render the witness unavailable. Rather, as *Owens* explained, it is a factor for the trier of fact to consider in evaluating the witness's current and earlier versions. *Id*. at 559, 108 S. Ct. 838. . . . We conclude that a witness who is present and responds willingly to questions is "available for cross-examination" as that term is used in *Crawford* in discussing the Confrontation Clause, just as *Owens* observed that such a witness is "subject to cross-examination" under the common understanding of that phrase. We believe no significance attaches to these slightly different verbal formulations.

*Fowler*, 829 N.E.2d at 466 (internal footnote omitted).

[18]     Here, M.N.C. testified at trial. Although she testified that she could not recall who assaulted her on April 29, 2019, she was "available" for cross-examination. This is sufficient for the purposes of the Confrontation Clause. *See id*. "The Confrontation Clause . . . generates "only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and

to what ever extent, the defense might wish.'" *Id.* at 469 (quoting *Owens, 484 U.S. at 559*).

[19]     For these same reasons, we conclude that Churn's right to confrontation under Article 1, Section 13 of the Indiana Constitution was not violated. Churn was able to "meet the witnesses face to face" as required by our constitution when he cross-examined M.N.C. at trial. *See Hill v. State*, 137 N.E.3d 926 (Ind. Ct. App. 2019) (citing *State v. Owings*, 622 N.E.2d 948, 950–51 (Ind. 1993)), *trans. denied*.

[20]     Finally, although Churn focuses on the admission of M.N.C.'s statements, we also observe that Dr. Wallace and Wohlt testified under oath and were subject to cross-examination concerning their testimony that M.N.C. identified Churn as her assailant. And M.N.C.'s statements to medical providers were non-testimonial for the purposes of the Confrontation Clause. *See Ward v. State*, 50 N.E.3d 752, 764 (Ind. 2016) (concluding that "identifying a domestic-violence victim's attacker is integral to the medical standard of care for" domestic violence cases).

[21]     In *Ward*, our supreme court observed that "a forensic nurse's primary function is providing medical treatment, not gathering evidence. Medical scholarship confirms that identifying attackers is integral to the standard of care for 'medical treatment' of domestic abuse victims." *Id.* at 761.

> Specifically, experts urge doctors and nurses to acknowledge the violence, assess patient safety, refer the victim for additional treatment or services, and document the injuries and the abuser.

> Indeed, a "forensic nurse is a nurse who provides specialized care for patients who are victims and/or perpetrators of trauma (both intentional and unintentional). Forensic nurses are nurses first and foremost," even though they are also specially trained in injury identification, evaluation, and documentation.

*Id.* at 761–62 (footnote and citations omitted).

[22] "[P]atient safety is a "critical" part of the comprehensive standard of care for treating victims of domestic violence." *Id.* at 763. Treating nurses and doctors must assess the patient's condition to determine what resources the patient needs to be safe. *Id.*

> The standard of care for "medical treatment" of domestic abuse goes beyond physical injuries, and even beyond immediate outcomes like who takes a victim home or what medications a patient receives. Rather, it requires nurses and physicians to rely on information obtained from patients to triage their injuries— both mental and physical—and implement comprehensive treatment plans. Doctors and nurses need to know the identity of the perpetrator when treating a victim of domestic violence.

*Id.* (citation omitted).

[23] This is even more compelling in this case given M.N.C.'s pregnancy. Wohlt was concerned with M.N.C.'s health and safety and of that of her unborn child. For all of these reasons, M.N.C.'s statements to both Wohlt and Dr. Wallace identifying Churn as her assailant were not testimonial and were properly admitted into evidence.

## *II. Mistrial*

[24] Churn argues that the trial court abused its discretion when it denied the two motions for mistrial he made during his jury trial. The denial of a motion for mistrial rests within the trial court's sound discretion, and we review that decision only for an abuse of discretion. *Brittain v. State*, 68 N.E.3d 611, 619 (Ind. Ct. App. 2017), *trans. denied*. The trial court is entitled to great deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of a given event and its probable impact on the jury. *Id*. at 620. To prevail on appeal from the denial of a motion for mistrial, a defendant must demonstrate that the statement in question was so prejudicial that he was placed in a position of grave peril. *Id.* The gravity of peril is measured by the probable persuasive effect of the statement on the jury. *Smith v. State*, 140 N.E.3d 363, 373 (Ind. Ct. App. 2020), *trans. denied.* Granting a mistrial "is an extreme remedy that is warranted only when no other action can be expected to remedy the situation." *Kemper v. State*, 35 N.E.3d 306, 309 (Ind. Ct. App. 2015), *trans. denied*.

[25] Churn requested two mistrials during his jury trial. The first occurred during the State's direct examination of Officer Plummer concerning the hang up 911 call. The State asked the officer, "[d]o you have personal knowledge if Damarco Churn ever lived at this address?" Tr. p. 34. Officer Plummer responded, "[w]e had calls previous there involving him, yes." *Id.* The second request for a mistrial occurred when M.N.C.'s grandmother testified that Churn was "currently incarcerated." Tr. p. 124. In response to Churn's motions for

mistrial, the trial court admonished the jury to disregard the challenged testimony. Tr. pp. 37–38; 128–29.

[26] "Generally, a timely and accurate admonition is an adequate curative measure for any prejudice that results." *Orta v. State*, 940 N.E.2d 370, 374 (Ind. Ct. App. 2011), *trans. denied*. And "[w]hen the jury is properly instructed, we will presume they followed such instructions." *Duncanson v. State*, 509 N.E.2d 182, 186 (Ind. 1987). "We seldom find reversible error when the trial court admonishes the jury to disregard the statement made during the proceedings." *Davidson v. State*, 580 N.E.2d 238, 241 (Ind. 1991).

[27] Churn argues that Officer Plummer's statement constitutes an evidentiary harpoon that placed him in a position of grave peril. An evidentiary harpoon refers to placing inadmissible evidence before the jury with the deliberate purpose of prejudicing the jurors against the defendant. *Kirby v. State*, 774 N.E.2d 523, 535 (Ind. Ct. App. 2002), *declined to follow on other grounds by Austin v. State,* 997 N.E.2d 1027 (Ind. 2013), *trans. denied*. The injection of an evidentiary harpoon may constitute prosecutorial misconduct requiring a mistrial. *Roberts v. State*, 712 N.E.2d 23, 34 (Ind. Ct. App. 1999), *trans. denied*. To prevail on such a claim, the defendant must show that the prosecution acted deliberately to prejudice the jury and that the evidence was inadmissible. *Id.* A defendant need not prove that he would have been acquitted but for the harpooning. *Jewell v. State*, 672 N.E.2d 417, 424 (Ind. Ct. App. 1996), *trans. denied*. However, when the jury's determination is supported by independent evidence of guilt and it was likely that the evidentiary harpoon did not play a

part in the defendant's conviction, the error is harmless. *Perez v. State*, 728 N.E.2d 234, 237 (Ind. Ct. App. 2000), *trans. denied*.

[28] Assuming for the sake of argument that the State intended to elicit Officer Plummer's testimony, the officer's testimony did not inform the jury of any specific incident or prior offense involving Churn. From the officer's testimony, the jury could only infer that Churn had some sort of contact with law enforcement in the past. We cannot conclude that the officer's testimony placed Churn in a position of grave peril or influenced the jury's decision to convict him, especially in light of the trial court's thorough admonishment and the other evidence proving that he assaulted M.N.C. And Churn has not offered any specific argument as to why the trial court's admonition was inadequate to cure any potential prejudice.

[29] Churn also cannot establish that he was entitled to a mistrial on the basis of Carter's testimony that he was currently incarcerated. Tr. p. 124. The jury was admonished to disregard her testimony. Also, after Carter's testimony, the State introduced evidence of a jailhouse video call that Churn made to M.N.C. after the first day of trial. Churn is wearing his jail uniform in the video. Therefore, Carter's testimony was cumulative of other evidence and did not place Churn in a position of grave peril. Moreover, the trial court appropriately admonished the jury that "the fact that the Defendant is incarcerated during this phone call is not to be used by you as any evidence of guilt." Tr. p. 164.

For all of these reasons, we conclude that the trial court did not abuse its discretion when it denied Churn's motions for mistrial.

# Conclusion

Churn has not established any error, much less reversible error, in the trial court's evidentiary rulings, or in its denial of his motions for mistrial. We therefore affirm his Level 5 felony domestic battery and strangulation convictions.

Affirmed.

Riley, J., concurs.

Tavitas, J., concurs with a separate opinion.

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Damarco L. Churn, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | Court of Appeals Case No. <br> 19A-CR-2799 |

**Tavitas, Judge, concurring.**

[33] I respectfully concur. I write separately to emphasize my belief that resolution of Issue I, *supra,* hinges on whether the statements are testimonial as analyzed by our Supreme Court in *Ward v. State,* 50 N.E.3d 752 (Ind. 2016). This analysis yields the same conclusion reached by the majority.

[34] In analyzing whether the Sixth Amendment's Confrontation Clause protections were violated, the *Ward* Court invoked the primary purpose test pursuant to *Ohio v. Clark,* 576 U.S. 237, 135 S. Ct. 2173 (2015), to determine if the statements made were testimonial. The primary purpose test asks: "whether, in light of all the circumstances, viewed objectively, the primary purpose of the

conversation was to create an out-of-court substitute for trial testimony." *Ward,* 50 N.E.3d at 759 (quotations omitted). *Ward* also noted that, "under the primary purpose test, statements to nurses, doctors, and other non-law enforcement officers are much less likely to be testimonial than statements to law enforcement officers," and the inquiry is "highly fact-sensitive." *Id.* (quotations omitted). Our Supreme Court also observed, especially in cases of "child abuse, sexual assault, and/or *domestic violence*," identifying an attacker "serves a primarily *medical* purpose" in order to properly treat the patient. *Id.* at 759 (emphasis supplied and quotations omitted).

[35]  Like the Supreme Court in *Ward,* I would resolve this issue by concluding that the statements to Dr. Wallace (a physician) and Wohlt (a forensic nurse examiner) identifying Churn are "non-testimonial, not barred by the Confrontation Clause, and properly admitted under Evidence Rule 803(4)." *See* Ind. Evid. R. 803(4) (including an exception to statements excluded by the rule against hearsay as "Statement Made for Medical Diagnosis or Treatment"); *see also* 13 Ind. Prac., Indiana Evidence § 803.104 (4th ed.) ("Statements made to non-physicians fall within Rule 803(4) if made to promote diagnosis or treatment.") (footnotes omitted).

[36]  In analyzing Article 1, Section 13 of the Indiana Constitution, the *Ward* Court noted the requirement that the defendant have the right to meet "*witnesses* face to face." *Ward,* 50 N.E.3d at 756 (emphasis added). Thus, the question is whether the defendant had the opportunity to confront the witness—not

necessarily the declarant—face to face. Churn had the opportunity to cross-examine Dr. Wallace and Wohlt at the trial.

[37]     Accordingly, I resolve this issue by finding first that the statements at issue here are non-testimonial. I use the template created by our Supreme Court in *Ward* to reach the same conclusion as the majority. As such, I concur.